1  Michael B. Reynolds, Bar No. 174534
   mreynolds@swlaw.com
2  Andrew B. Still, Bar No. 312444
   astill@swlaw.com
3  Allison C. Murray, Bar No. 329336
   acmurray@swlaw.com
4  SNELL & WILMER L.L.P.
   600 Anton Boulevard, Suite 1400
5  Costa Mesa, California 92626-7689
   Telephone:    714.427.7000
6  Facsimile:    714.427.7799

7  *Proposed* Attorneys for HPC Vineburn, LLC

8

9              UNITED STATES BANKRUPCTY COURT

10   CENTRAL DISTRICT OF CALIFORNIA – SAN FERNANDO VALLEY DIVISION

11

12  In re:                              Case No. 1:25-bk-11455-MB

13  HPC VINEBURN, LLC,                  Chapter 11

14              Debtor-in-Possession.   **Declaration of Jeffrey Seltzer**

15                                       Hearing Information:
                                         Date:      September 26, 2025
16                                       Time:      10:00 a.m.
                                         Place:     Courtroom 303
17                                                  21041 Burbank Blvd.
                                                    Woodland Hills, CA 91367
18

19

20

21      I, Jeffrey Seltzer, hereby declare as follows:

22

23      1.      I am the manager and sole member of Highpoint Vineburn, LLC, a California

24  limited liability company and the manager of HPC Vineburn, LLC, also a California limited

25  liability company and the Debtor and Debtor-in-Possession herein ("Debtor").  I am a long-time

26  resident of Los Angeles County and have extensive experience in purchasing, selling, owning and

27  managing numerous commercial properties throughout the greater Los Angeles metropolitan area

28  over the past 30-plus years. I have an MBA in finance from the University of Chicago and a law

SNELL
& WILMER

degree from Osgoode Hall Law School (one of the top 3 law schools in Canada) although I no longer practice law. After graduating from Chicago, I worked at both Blackstone Inc. (one of the largest private equity firms focused on real estate in the U.S. with over $1 trillion in assets) and also Hines (one of the largest developers and owners of real estate in the U.S. with over $93 billion in assets under management). In my career, I have been involved with over $2 billion in transactions including purchasing, selling, owning and managing.  I make this reply relevant to the pending bankruptcy action and the adverse judgment (the "Judgment") entered against it in that certain lawsuit styled as *Joseph F. Farivar Investment Group, Inc. vs. HPC Vineburn, LLC, et al.* (the "Lawsuit"), pending in the Los Angeles County Superior Court (the "Superior Court") as Case No. 23 STCV00319.  The Debtor appealed the Judgment in 2024, and that appeal is pending in the Court of Appeals for the Second Appellate District (the "Court of Appeals"), Appeal No. B343432 (the "Appeal").

2.     The Debtor is engaged in the business of owning and leasing out certain real property located at 1919 Vineburn Avenue, Los Angeles, California (the "Debtor Property").  I have served as the member and manager of the Debtor's managing entity ever since the Debtor was formed for the purpose of acquiring the Debtor Property in 2013 from Meruelo Maddox Properties-119 Vineburn Street, LLC ("Meruelo Maddox").  I was intimately involved in the Debtor's purchase of the Debtor Property and the management of the Debtor ever since, and have been actively involved in the Lawsuit, the Appeal and the current bankruptcy (which is the Debtor's only bankruptcy filing and the only bankruptcy filing I have been involved with in my entire 30+ year career in commercial real estate).  The matters set forth herein are of my own personal knowledge or I have learned them by reference to matters contained within the Debtor's business records, which records are made or kept in the ordinary course of business at or about the time of the event recorded by personnel of the Debtor whose job it is to make and keep such records, or I have learned them by reference to matters of public record, including but not limited to filings with the Superior Court, the Official Records of the County of Los Angeles, and the Court of Appeals.  If called upon to do so, I could and would competently testify to the truth of

Declaration of Jeffrey Seltzer

4921-0606-7050

the matters set forth herein, except those matters specifically set forth on information and belief, as to which I am informed and believe them to be true.  As to those matters set forth as opinions, I am qualified to offer these opinions based on my extensive experience in purchasing, selling, owning and managing commercial real estate in the greater Los Angeles metropolitan area for over three decades.

3.      The Debtor's bankruptcy was precipitated in large measure by the Superior Court's November 7, 2024, judgment in the Lawsuit against the Debtor (and Meruelo Maddox, which sold the Debtor Property to the Debtor), for approximately $12.2 million (the "Judgment"), and the aggressive efforts of Farivar Investment  Group ("FIG") to enforce that Judgment. However, this bankruptcy is far from a "two-party dispute" as alleged by FIG.  On the contrary, the Debtor cannot realistically reorganize without amortizing and financing the $12.2 million Judgment that encumbers the Debtor Property.  The Debtor is not attempting to resolve its dispute with FIG in bankruptcy court, but rather attempting to reorganize and restructure that debt so that it is manageable, so that the Debtor's main asset – the Debtor Property – will not be lost to execution by the judgment creditor FIG, and so that the Debtor's business of leasing out the Debtor Property and holding the Debtor Property while it appreciates will not be entirely lost. Even if the total amount the Debtor owes to FIG is ultimately liquidated outside the bankruptcy court (via the Appeal and the Lawsuit), the structure of that obligation and the terms under which it can be met, are in my view proper subjects for the Bankruptcy Court to determine.

4.      This is a single-asset real estate case ("SARE"), in that the Debtor's main asset is the Debtor Property and the lease, rents, issues and profits derived therefrom.  The Debtor has 35 investor members, most of whom own less than three percent (3%) of the company (although I myself indirectly own approximately 36% share of the company).  The Debtor acquired the Debtor Property from Meruelo Maddox in 2013.  At the time of purchase, certain hazardous volatile organic compounds ("VOCs") had been identified at the Debtor Property.  To be clear, the existence of these VOCs predated our acquisition of the Debtor Property, a point which is not

Declaration of Jeffrey Seltzer

4921-0606-7050

in dispute.  But as part of the purchase agreement for the Debtor Property, Meruelo Maddox was required to obtain (and did obtain) a "no further action" determination regarding the VOCs from the Los Angeles County Fire Department, which was the oversight agency at that time.  Indeed, Meruelo Maddox's commitment to obtaining this determination was material to our decision to go through with the purchase of the Debtor Property, as was set forth in the purchase agreement I negotiated on behalf of the Debtor back in 2013.

5.    Notwithstanding the no further action determination issued by the Los Angeles County Fire Department, later, the Los Angeles Regional Water Quality Control Board ("Water Board") assumed oversight of environmental issues on the Debtor Property and, in 2018, issued Order No. R4-2018-0150, pursuant to California Water Code Section 13267.  This order, which was amended on September 22, 2023 (the "Water Board Order"), required the Debtor to perform numerous environmental investigations to fully characterize and assess hazardous substances at or migrating from the Debtor Property that predated the Debtor's ownership.  These substances included, but were not limited to, 1,4-Dioxane, which was not identified during the due diligence for the Debtor Property acquisition.  The Debtor has been complying with the Water Board Order by continuing to perform the required investigations.  The Debtor is regularly billed by the Water Board for its oversight costs, which are currently being paid (with a reservation of rights) by Fortitude Re, the successor to an AIG Specialty Insurance Company Pollution Legal Liability Select Policy (the "Fortitude Policy").

6.    In 2023, FIG (later joined by Bordan Shoe Company, Inc.) filed the Lawsuit against the Debtor, claiming contamination historically released from the Debtor Property had migrated to FIG's adjacent, downgradient property (the "FIG Property").  On September 24, 2024, the Superior Court granted summary adjudication in favor of FIG for certain of its causes of action.  FIG then dismissed the remaining causes of action, enabling the Superior Court to enter the Judgment in FIG's favor on or about November 7, 2024.  The Judgment is in the principal amount of approximately $12,245,108.42 and was based on the untrue assumption that the Debtor

Declaration of Jeffrey Seltzer

will **never remediate** 1,4-Dioxane on the Debtor Property and the contamination from the Debtor Property would therefore continuously contaminate the FIG Property, resulting in repeated remediation efforts at the FIG Property. This assumption is untrue as Debtor is committed to remediating 1,4-Dioxane at the Debtor Property. It is currently (and has been) working closely with the Water Board to perform investigative work in order to fully delineate any sources of contamination, which is necessary before remediation can begin. The Debtor has fulfilled all directives of the Water Board and maintains a positive relationship with the agency. As Farivar knows full well, only once the Water Board has reviewed the results of all the investigative work and determined that investigative efforts are complete, and then reviewed and provided comments and approval for a remedy, will Debtor implement remediation pursuant to the terms of the Water Board's directive.

7.      Contrary to the misrepresentations by Farivar, in December 2024, the Debtor timely filed its Notice of Appeal to the Court of Appeal of the State of California for the Second Appellate District, Division P, Appeal No. B343432 (the "Appeal"). Among other things, the Debtor alleges that the Superior Court erred by refusing to consider the opinions of the Debtor's retained expert (despite overruling FIG's objections to that evidence) at the summary adjudication stage, including but not limited to the conclusion that the cost of groundwater remediation for both the Debtor Property and the FIG Property would collectively be only $5.8 million (as opposed to the almost $12 million estimate FIG claimed for cleanup of just the FIG Property). Other problems include the Superior Court's refusal to consider the extent to which the contamination of the FIG Property has and continues to emanate from sources other than the Debtor Property – including the FIG Property itself, which has been undergoing investigation and remediation efforts for decades due to contamination caused by historical manufacturing operations at the FIG Property, and which we believe is a source of the 1,4-Dioxane.

8.      Other significant assets of the Debtor's estate may also include the proceeds of two environmental pollution liability insurance policies – the Fortitude Policy and a policy issued by

Chubb – each in the amount of $3 million for a potential combined total of $6MM (of which approximately $600,000 has already been paid out).  Although claims made on both policies were accepted subject to a reservation of rights, the Debtor is exploring the extent to which the policies can be utilized to contribute to the implementation of clean-up and remediation efforts for both properties.  The Debtor is also exploring potential causes of action against its former litigation counsel and Chubb related to the conduct of the underlying litigation.  However, we have not reached any conclusions regarding the existence or value of any such assets, and FIG's conclusion that the Appeal lacks merit because we are investigating these assets is misguided to say the least.

9.    We are currently waiting for the clerk of the Superior Court to prepare the transcript, which will trigger briefing in the Appeal.  This is why the Debtor is seeking relief from the automatic stay; i.e., to pursue the Appeal.  Pursuing the Appeal is necessary to liquidate the amount of a disputed obligation; i.e., FIG's claim against the estate.  By contrast, the relief from stay requested by FIG (that it be allowed to foreclose on the Debtor Property notwithstanding the Appeal) is designed to strip the estate of its most significant asset (the Debtor Property), to the detriment of all other constituents of the estate.

10.    FIG has aggressively enforced the Judgment, including by attempting an execution sale of the Debtor Property, obtaining and enforcing a turnover order for the Debtor's bank accounts (which were almost entirely stripped of funds before the August 8, 2025, petition date), and obtaining and enforcing an assignment order against the rents generated by the Debtor Property (pursuant to which the August 2025 rents were seized).  FIG recorded its Notice of Levy against the Debtor Property and, as a result, holds a security interest against the Debtor Property in the amount of the Judgment.  The Debtor does not at this time concede the validity or enforceability of that security interest, the assignment order, or the turnover order.

Declaration of Jeffrey Seltzer

11.    However, even if valid and enforceable, FIG's lien is in a junior position as against the Debtor Property.  John Hancock Life Insurance Company (USA) is the senior lender on the Debtor Property ("Hancock"), and is owed approximately $7.5 million.  To the extent that the assignment order is valid, FIG has taken Hancock's collateral, because Hancock's Deed of Trust includes an assignment of rents.  As a result, I personally paid the Debtor's monthly mortgage payment to Hancock in August 2025 (approximately $45,000), to prevent the Debtor from slipping into default with its consensual lender.  Therefore, the Debtor is current on its payments to Hancock.  The Debtor is also current on its real estate taxes and insurance.

12.    I would estimate the value of the Debtor Property to be approximately $23 million, possibly more, in a remediated state.  Indeed, in April of this year, I received an appraisal of the Debtor Property from Brian Alex Bregman MAI, a true and correct copy of which is attached hereto as Exhibit "B."  In this appraisal, Mr. Bregman concluded the value was $22,695,000, in line with my own estimate, but he did not include the impact of the litigation and environmental problems or the expenses related thereto.

13.    Our expert in the Lawsuit testified that the clean-up costs for groundwater at both the FIG Property and Debtor Property would total roughly $5.8 million.  Our expert has also informed us that cleanup of just the Debtor Property, including both soil removal and groundwater, is estimated to cost $4.3 million. Selling the Debtor Property before remediation is complete would result in a significant discount due to the estimated remediation costs, and risk that a buyer would perceive. Additionally, if the Debtor Property were sold in a foreclosure or execution sale, as I understand Farivar would like to do, the insurance proceeds that may be available for the investigation and remediation would likely not be available for the benefit of the estate or its constituents, including FIG. The way to maximize the value of the Debtor Property is for Debtor to complete remediation at the Property using its insurance proceeds, before selling or refinancing the Debtor Property. This not only benefits the estate and creditors, but ensures that the Debtor Property is cleaned up, which is particularly important given its location to residences.

4921-0606-7050

14. The Debtor has historically operated profitably. The Debtor's operating capital consists of rents generated from its sole tenant on the Debtor Property, which leases 100% of the Debtor Property. That tenant, 2938 East 54th Street Warehousing, LLC, dba ReadySpaces, dba ReadySpaces Management, pays regularly and enjoys a cordial relationship with the Debtor. The Debtor may also request capital contributions from its equity holders, although this has proven problematic in light of the potentially negative equity in the Debtor Property since entry of the Judgment.

15. It is unclear when the Appeal will be decided. The Debtor has been waiting since January for the Superior Court to prepare the record. Once it is prepared (hopefully soon), there will be three months of briefing. I understand that after the hearing, the Appellate Court is to rule within three months. However, I do not know when the Appellate Court will set the matter for hearing. As a result, while the Appeal conceivably could be decided within nine months, it is also possible it will not be decided for another 12 months or longer. It is therefore likely that we will need to confirm a chapter 11 plan ("Plan") before the Appeal is decided, and which will call for multiple different contingencies. In any event, we anticipate that the Debtor's Plan will need to account for the fact that the Debtor Property's value will – once the remediation is completed– be considerably greater than the aggregate amount of liens encumbering it. Indeed, the Debtor's Plan will have a doubly-positive effect on value, in that the remediation work will not only increase the value of the Debtor's asset, but will also reduce the amount of FIG's claim against the Debtor, which is based on clean up costs for FIG's contiguous, downgradient property. Of course, if the Appeal is successful, on remand to the Superior Court it is expected that any future judgment in FIG's favor would be substantially less than the Judgment as a jury would take into account FIG's own contribution to the contamination and would evaluate damages using reasonable assumptions, including that any 1,4 Dioxane source on the Debtor Property will be remediated.

4921-0606-7050

16.    Alternatively, the Debtor's Plan may call for selling or refinancing the Debtor Property under certain circumstances, depending on market factors and the speed with which the remediation efforts can be successfully concluded.  The Debtor is also exploring the option of raising capital or a combination of debt and equity to restructure and amortize the Judgment.

17.    I take issue with other assertions raised by FIG.  For instance, there is, contrary to FIG's assertions, doubt regarding the extent to which the Debtor is, or should be, liable for the contamination of the FIG Property.  As referenced elsewhere in my declaration, there is evidence that the prior tenants at the FIG Property utilized 1,4-Dioxane in their business operations that may be a substantial contributing source of the damage to the FIG Property.

18.    Nor is it accurate that we "refused to accept responsibility" for the contaminants or the clean up. This is a total misrepresentation by FIG that is utterly unsupported by evidence. Instead, Debtor has been working closely with the Water Board for many years in its investigation, which will inform how the remediation should proceed.  It would be imprudent and impracticable to prematurely proceed with remediation efforts only to be ordered by the Water Board to proceed along an entirely different path.

19.    FIG also falsely contends we filed the bankruptcy to avoid posting an appeal bond. FIG ignores that a bond was not attainable. To obtain a bond, we were informed by a bond broker we would have needed to collateralize the bond with unencumbered assets worth 150% of the amount of the Judgment.  In other words, we would have needed roughly $18 million in equity in the Debtor Property – simply not possible with Hancock's $7.5 million senior lien and FIG's $12.4 million junior lien, particularly given the contaminated state of the Debtor Property.  We requested the insurer back the bond, but it refused. Efforts to raise the necessary capital from existing equity interest holders fell far short of the goal.  And the Court of Appeals rejected our petition to stay enforcement of the Judgment without a bond pending the Appeal.  Nor did we have the approximately $500,000 in cash that would have been needed just to pay the annual

Declaration of Jeffrey Seltzer

4921-0606-7050

premium for the bond, due to FIG's aggressive seizure of our cash reserves. This left us with ***no choice*** but to protect the Debtor Property and restructure the Debtor or lose the Debtor Property to FIG – which would have essentially destroyed the Debtor and its business, prevented any recovery to any of the other creditors (besides Hancock), and precluded any return to the 35 equity investors. The Debtor must survive in order to succeed in its Appeal, which I believe is almost certain to succeed given the Superior Court's material rulings that contradicted its own evidentiary rulings. It appears FIG is doing everything it can to prevent Debtor from finally having its day in court to correct the Superior Court's devastating mistakes in its ruling.

20.    I do not believe that we filed this bankruptcy in bad faith. We filed this bankruptcy to preserve the Debtor, its assets and its business, and to protect all creditors – not just FIG – as well as the equity investors to the extent possible.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 19th day of September 2025, at Los Angeles, California

Jeffrey Seltzer

Declaration of Jeffrey Seltzer

4921-0606-7050

# Exhibit B

**AN APPRAISAL REPORT**
**OF AN INDUSTRIAL PROPERTY**



Located at
**1919 Vineburn Ave.**
**Los Angeles, CA 90032**

(Report No. 0425B02)

DATE OF REPORT
**April 21, 2025**

DATE OF VALUE
**April 18, 2025**

PREPARED FOR
**Mr. Jeffrey Seltzer**
c/o Edgcomb Law Group, LLP
355 S. Grand Ave., Ste 2450, #2049
Los Angeles, CA 90071

PREPARED BY



5850 Canoga Ave., Suite 400
Woodland Hills, California 91367
(818) 225-9550



April 21, 2025


Mr. Jeffrey Seltzer
c/o Ms. Tiffany R. Hedgpeth
Edgcomb Law Group, LLP
355 S. Grand Ave., Ste 2450, #2049
Los Angeles, CA 90071


Re:    1919 Vineburn Ave.
       Los Angeles, CA  90032
       APN 5215-014-005, 006

Dear Mr. Seltzer:

As you requested, I have prepared an *Appraisal* presented in an *Appraisal Report* on the above-referenced property.  In said appraisal, I have estimated the market value of the *leased fee interest* of the subject property on an *As-Is* basis.

The date of value applicable to the value estimate is April 18, 2025.  The subject was inspected on April 18, 2025.  The date of this report is April 21, 2025, which is the date this appraisal was completed.

Based upon the investigations conducted and the analyses made, and my experience in the field of real property valuation, I have formed the opinion that the market value of the leased fee interest in the subject property as of April 18, 2025, *As-Is,* and subject to the Assumptions and Limiting Conditions and the Certification set forth in this report is:

**Twenty Two Million Nine Hundred and Sixty Five Thousand Dollars**

**($22,965,000)**

The appraisal report conforms to the appraisal policies, procedures, standards and requirements as set forth by Title XI of the Federal Financial Institutions Reform, Recovery, and Enforcement Act of 1989 FIRREA), the Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation and the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.



*Letter of Transmittal – 1919 Vineburn Ave., Los Angeles CA  – April 21, 2025*

This attached appraisal report and addenda were prepared for **Mr. Jeffrey Seltzer, c/o Edgcomb Law Group, LLP**.  This appraisal is intended for the exclusive use of **Mr. Jeffrey Seltzer, c/o Edgcomb Law Group, LLP** and their duly authorized representatives to establish the market value of the subject property to be utilized for litigation purposes.  This appraisal has been prepared in accordance with USPAP.  The use of this appraisal by others is prohibited.

If you have any questions regarding this appraisal, please do not hesitate to call my office.

Respectfully submitted,

Brian Alex Bregman, MAI
California Certification No. AG008978



3

*Subject – Aerial Image*





4

<u>SUBJECT PHOTOGRAPHS</u>

*Subject Property – Facing Vineburn Ave.*



*Subject Building – Facing Northeast*





5

SUBJECT PHOTOGRAPHS

*Subject Building – Facing Southeast*



*Subject Building – Facing Northwest*





6

<u>SUBJECT PHOTOGRAPHS</u>

*Front Warehouse Building*



*Small Storage Building*





SUBJECT PHOTOGRAPHS

*Access From Valley Blvd.*



*Subject – Interior*





8

SUBJECT PHOTOGRAPHS

*Subject – Interior*



*Subject – Interior*





9

SUBJECT PHOTOGRAPHS

*Subject – Interior*



*Subject – Interior*





10

<u>SUBJECT PHOTOGRAPHS</u>

*Subject – Interior*



*Subject – Interior*



SUBJECT PHOTOGRAPHS

*Subject Street – Vineburn Ave. - To North*



*Subject Street – Vineburn Ave.  – To South*



*Subject Street – Valley Blvd. - To East*



*Subject Street – Valley Blvd.  – To West*



TABLE OF CONTENTS

# Table of Contents

Letter of Transmittal ...................................................................................................................................... 2
Subject Photographs ...................................................................................................................................... 4
Table of Contents .......................................................................................................................................... 14
Certification Statement ................................................................................................................................. 15
Summary of Important Facts and Conclusions ............................................................................................. 16

**Descriptive Section**

*Scope of the Appraisal and Definitions* ...................................................................................................... 18
*Identification of Subject Property* ............................................................................................................... 24
*History of the Subject Property* ................................................................................................................... 24

**Property Description and Analysis**

*Site Description and Analysis* ...................................................................................................................... 25
*Improvement Description and Analysis* ....................................................................................................... 32

**Market Analysis**

*Market Area Description* .............................................................................................................................. 35
*Subject's Competing Market Area* .............................................................................................................. 42

**Cost Approach**

*Not Considered* ............................................................................................................................................ 45

**Sales Comparison Approach**

*Sale Comparables* ........................................................................................................................................ 47
*Adjustment Grid* ........................................................................................................................................... 52
*Sale Comparison Approach Conclusions* ................................................................................................... 53

**Income Approach**

*Income Capitalization Approach* ................................................................................................................. 55
*Market Rent Analysis* ................................................................................................................................... 57
*Expense Analysis* ......................................................................................................................................... 61
*Capitalization Rate Analysis* ....................................................................................................................... 62
*Income and Expense Analysis* ..................................................................................................................... 63

**Reconciliation and Final Value Estimate** ................................................................................................. 64

**Addenda** ...................................................................................................................................................... 65



CERTIFICATION STATEMENT

**Certification Statement**

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- I have made a personal inspection of the property that is the subject of this report.

- No one provided significant real property appraisal assistance to the person signing this certification.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, I have completed the continuing education program for Designated Members of the Appraisal Institute.

Brian Alex Bregman, MAI
California Certification No. AG008978



15

SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

**Property Summary**

| | |
|---|---|
| Assessor's Parcel Number: | 5215-014-005, 006 |
| Improvements: | An industrial building, front warehouse building and small storage building |
| Total Net Rentable Area: | 123,411 sq. ft. (lease, marketing brochure) |
| Year Built: | 1931, 1950, 1984 |
| Land Area (Net): | +/- 5.80 acres (+/- 252,561 sq. ft.) |
| Zoning: | CM (Commercial Manufacturing Zone), Los Angeles |

**Highest and Best Use**

| | |
|---|---|
| Highest and Best Use As Vacant: | Construct an industrial building or hold for future development |
| Highest and Best Use As Improved: | Currently, the subject is improved with an industrial building, small front warehouse building and small storage building.  The buildings are in average condition with no curable physical or functional obsolescence noted.  Our detailed analysis illustrates that the buildings make a significant economic contribution to the subject site.  Any major alterations, or removal of the structure, would not be economically feasible. Therefore, the existing improvements are considered to be the Highest and Best Use of the subject site As Improved. |
| Present Use: | An industrial property |



16

SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

Value Indicators

| | |
|---|---|
| COST APPROACH: | Not Considered |
| SALES COMPARISON  APPROACH: | $ 25,300,000 |
| INCOME APPROACH: | $ 20,625,000 |
| **FINAL VALUE RECONCILIATION:** | **$ 22,965,000** |
| INTEREST APPRAISED: | Leased fee |
| VALUE APPRAISED: | Market Value |
| DATE OF INSPECTION: | April 18, 2025 |
| DATE OF VALUE: | **April 18, 2025** |
| DATE OF REPORT: | April 21, 2025 |



17

Case 1:25-bk-11455-MB    Doc 45-1    Filed 09/19/25    Entered 09/19/25 16:47:16    Desc
Declaration of Jeffrey Seltzer    Page 29 of 81

SCOPE OF THE APPRAISAL

*SCOPE OF THE APPRAISAL*

Scope defines the type of report in relation to the appraisal problem and outlines procedures and data utilized in the appraisal assignment.  This is an appraisal report which has been prepared according to the Uniform Standards of Professional Appraisal Practice (USPAP), the Ethics and Standards of the Appraisal Institute and Title XI of the Federal Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).

As part of this assignment, the appraisers have made a number of independent investigations and analyses.  Listed below are the investigations undertaken and the major data sources relied upon.

- A physical inspection of the subject was performed on April 18, 2025 to gather data with regard to the physical characteristics of the site.  An interior inspection was performed on the main building.  However, the subject property has been divided and subleased to numerous tenants.  It was not possible to inspect the demised areas.  In addition, an interior inspection was not performed on the small warehouse building and small storage building.  For the purpose of this appraisal, it is assumed that the condition of the uninspected areas of the property are similar to the inspected areas (the property appears to be in average overall condition).

- The neighborhood and competitive market area were inspected to determine neighborhood boundaries, potential new development, potential lease and sale competition and positive and negative neighborhood environmental influences.

- Information with regard to the improvements was based upon our physical inspection and RealQuest, CoStar, ZIMAS, a historic marketing brochure and lease.  According to CoStar, the subject buildings total 122,345 sq. ft., which is larger than the square footage reported in RealQuest (117,091 sq. ft.).  According to the historic marketing brochure the buildings total 123,411 sq. ft., which is the same as the square footage reported in the lease (123,411 sq. ft.).  For the purpose of this appraisal, we have relied on the square footage reported in the historic marketing brochure and the lease, as this is the square footage which has historically been utilized to market the property for sale and to lease the subject property.  However, no warranties are made with regard to the exact square footage of the subject buildings.  If more accurate square footage estimates are required, we recommend that a survey be performed by a licensed architect.  In addition, site size square footage information and dimensions were obtained from public records.  A survey was not submitted in conjunction with this appraisal.  If exact site size square footage is required, we recommend consulting a licensed surveyor.  No warranties are made herein with regard to the size of the subject property.  If the square footage of the building or site is determined to be different from the square footage reported herein, we reserve the right to modify the value conclusions in the report.



18

SCOPE OF THE APPRAISAL

- Some of the factual information concerning improved transfers has been obtained from public and private data sources including RealQuest, CoStar, various brokers specializing in industrial property sales and by researching tax records.

- The comparables were inspected to determine their comparability and usefulness in comparison with the subject property. An attempt has been made to contact buyers, sellers and brokers to verify all information and determine the motivations of the parties involved.

- Information with regard to the subject zoning and nearby land uses was obtained from the City of Los Angeles, Department of Building and Safety. The location analysis was derived from information compiled by data obtained from CoStar, brokers and personal physical inspection.

- Research was performed related to marketing time, financing and investor trends from public sources and from our market participant interviews above.

- The aforementioned information and research was then organized and the appraisal completed. The sales comparison approach and the income approach were considered to be relevant. The cost approach was not considered herein as it was not considered to be relevant. Please refer to the body of the appraisal for additional clarification and detail with regard to the valuation issues.



19

DESCRIPTIVE SECTION

### *PURPOSE OF THE APPRAISAL*

The purpose of this appraisal is to set forth the investigations and analysis leading to our opinion of the market value of the subject's leased fee interest, "As Is".

This appraisal report and the final estimate of value are subject to the Basic Assumptions and Limiting conditions which are outlined in the appendix of this report.

### *INTENDED USE OF THE APPRAISAL*

This appraisal is intended for the exclusive use of **Mr. Jeffrey Seltzer, c/o Edgcomb Law Group, LLP** and their duly authorized representatives to establish the market value of the subject property to be utilized for litigation purposes.  This appraisal has been prepared in accordance with USPAP.  The use of this appraisal by others is prohibited.

### *PROPERTY RIGHTS APPRAISED*

The *Leased Fee Estate*[1] consists of an ownership interest held by a landlord with the rights of use and occupancy conveyed by lease to others.  The rights of the lessor (the leased fee owner) and the lessee are typically specified by contract terms contained within the lease.

The subject is appraised "As Is".  "*Market Value As Is*" is an estimate of the market value of the property in the condition observed upon inspection and as it physically and legally exists without hypothetical conditions, assumptions, or qualifications as of the date of the property inspection.

In the data collection and appraisal process, no value was given to personal property, trade fixtures or intangible items.

### *DATE OF VALUATION AND DATE OF REPORT*

The effective date of the appraisal (date of valuation) is April 18, 2025.  The analyses, opinions and conclusions set forth apply only to the date of value.  The last date of inspection was April 18, 2025.  This appraisal is dated April 25, 2025, which corresponds to the completion of the investigation, analysis of relevant data and the completion of this report document.

---

[1] The Dictionary of Real Estate Appraisal, Fifth Edition, the Appraisal Institute, ©2010, pg. 111



20

DESCRIPTIVE SECTION

### *EXTRAORDINARY ASSUMPTIONS*

The subject site was historically used as a metal fabricator for the aerospace industry. The site has been the subject of numerous environmental investigations in the past including Phase I Environmental Site Assessments (ESAs) and subsurface investigations. The site has been investigated for volatile organic compound (VOC) impacted soil, soil gas, and groundwater.

According to the *Subsurface Investigation Report and Human Health Risk Evaluation Former Nardon Manufacturing Corporation Facility,* performed by Hazardous Management Consulting, for California Regional Water Quality Control Board, Los Angeles Region (LARWQCB), dated May 7, 2020, although residual VOCs were discovered beneath the site, these contaminants were not determined to present a risk to human health or present a significant environmental threat. Based on these results, the LACFD issued a no further action (NFA) letter for the site in September 2013 (LACFD, 2013).

During investigations at the Former Square D Facility property located immediately west of and hydraulically downgradient from the site, tetrachloroethylene (PCE), trichloroethene (TCE), 1,1-dichloroethene (1,1-DCE), and 1,4-dioxane were discovered in groundwater. Based on these results, the past operations at the site, and the hydraulic direction of the site from this facility, the LARWQCB issued a directive to HPC Vineburn, LLC, current owners of the site, to complete additional site assessment activities to further assess possible sources areas that might be present and possibly contributing to the groundwater issues.  See the report prepared by Hazardous Management Consulting for details with regard to the aforementioned contamination.

According to information submitted, the exact cost to remediate the subject site has not yet been determined. The owner of the subject property has a *Premises Pollution Liability Insurance Policy* issued by Chubb and an *Environmental Insurance Policy* issued by AIG Environmental each of which limited the owner's financial responsibility to remediation costs above $3,000,000. It is an extraordinary assumption that the owner's insurance policies are sufficient to cover all of the economic costs of remediation and there is no economic/financial impact of the contamination on the subject property (no deductions have been made in this appraisal for contamination issues). No warranties are made in this appraisal for the costs associated with environmental issues or the cost associated with remediation. The value conclusions in this appraisal would be impacted if the contamination had an economic impact on the subject property.



21

DESCRIPTIVE SECTION

### DEFINITION OF MARKET VALUE

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1)    buyer and seller are typically motivated;

(2)    both parties are well informed or well advised, and acting in what they consider their own best interests;

(3)    a reasonable time is allowed for exposure in the open market;

(4)    payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

(5)    the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[2]

### COMPETENCY STATEMENT

The appraiser performing this assignment has the requisite knowledge and experience to complete this appraisal assignment and has appraised this type of property before.  Please see Appraiser's Experience included in the Addenda of this report for additional information.

---

[2] Office of the Comptroller of the Currency under 12 CFR, Part 54.42(g), 55 *Federal Register* 34696, August 24, 1990, as amended at 57 *Federal Register* 12202, April 9, 1992; 59 *Federal Register* 29499, June 7, 1994



22

DESCRIPTIVE SECTION

***REASONABLE EXPOSURE TIME***

Exposure time is the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market.

The value of the subject property has been based on the market value definition presented earlier in this report.  The market value definition calls for the valuation to be established based on exposure in the open market for a "reasonable time", which is influenced by price, use type and anticipated market conditions, such as changes in the cost and availability of funds.

The appraisers have surveyed a number of brokers in the subject's market area in order to determine the supply of and demand for properties similar to the subject property.  Additional searches were performed with data sources such as CoStar to analyze exposure periods for industrial properties in the subject's competing market area.

Based upon current trends in the marketplace, and assuming the property has been listed with a qualified commercial brokerage company that uses aggressive and knowledgeable listing agents and techniques, a reasonable exposure time for the subject property based on its current condition is projected as follows:

As-is condition                                    2 to 6 months

Implicit in the value conclusions rendered in this appraisal was the assumption that the subject had previously been exposed to the market at the above indicated time period which corresponds to the estimated time required to sell the property in its as-is condition.



### *IDENTIFICATION OF THE SUBJECT PROPERTY*

Current Property Use:              An industrial property

Legal Address:                     1919 Vineburn Ave.
                                   Los Angeles, CA 90032

Additional Address:                4361 Valley Blvd.
                                   Los Angeles, CA 90032

Assessor's Parcel Number:          5215-014-005, 006

### *LEGAL DESCRIPTION*

The legal description is lengthy and has been included in the addenda section of this appraisal.

### *STATEMENT OF OWNERSHIP*

According to the grant deed, the subject is vested in HPC VINEBURN, LLC, a California limited liability company.  According to RealQuest, there have been no sales or transfers noted in the 3 years preceding the effective date of valuation.



PROPERTY DESCRIPTION AND ANALYSIS

*SITE DATA AND ANALYSIS*

| | |
|---|---|
| **Site Size:** | +/- 252,561 sq. ft. (+/- 5.80 acres) |
| **Dimensions:** | Irregular |
| **Lodgment:** | Interior |
| **Access:** | Vehicular access is available from Valley Blvd. (via access easement) and Vineburn Ave. |
| **Utilities:** | All available |
| **Street Parking:** | Yes |
| **Topography:** | Sloping to the northwest and level |
| **Easements:** | Non-exclusive easement for ingress and egress. |
| **Flood Zone:** | Outside flood zone |
| **Nearest Fault:** | Upper Elysian Park (within fault zone) |
| **Liquefaction Zone:** | Yes |
| **Zoning:** | The subject is zoned CM (Commercial Manufacturing), City of Los Angeles. The CM is a hybrid zoning designation that blends elements of commercial and light industrial uses. It is designed to accommodate businesses that require both commercial and light manufacturing activities, providing flexibility for a range of operations. The CM zone allows for a variety of uses, including: |

**Commercial Uses**: Any use permitted in the C2 (Commercial) zone, such as retail stores, offices, and wholesale businesses.

**Manufacturing and Industrial Uses**: Light manufacturing activities, such as assembly, compounding, or treatment of articles from prepared materials like textiles, plastics, and glass.

**Residential Uses**: Limited residential uses are permitted, including shelters for the homeless and joint living and work quarters, provided they comply with specific regulations.



25

PROPERTY DESCRIPTION AND ANALYSIS

***Assessments and Taxes***

The following summarizes the 2024/25 assessment and tax data:

| | |
|---|---|
| Parcel Number | 5215-014-005, 006 |
| Assessed Year | 2024/25 |
| Tax Rate Area | 12703 |
| Land | $ 5,391,717 |
| Improvements | $ 2,274,514 |
| **Total Real Property** | **$ 7,666,231** |
| | |
| **Total Taxes** | **$ 111,452** |
| Total Tax Rate | .014538 (1.45%) |

The method of taxation of real property in California was mandated by the Jarvis-Gann property tax initiative. Under the Jarvis-Gann property tax initiative, real estate taxes were reduced to one percent of the property's full market value as of the 1975-76 fiscal year, plus any voter-approved bonded indebtedness.

The assessor's assessment of market value is limited to a two percent annual increase, unless the property is transferred or there is substantial new construction. In either of these two events, the property is reappraised to current market value, usually as evidenced by the sales price or the construction cost. The current assessed values are not necessarily an accurate reflection of market value, as they are not particularly sensitive to the fluctuations in market value, unless reappraised. Assessed value is the figure at which property is put on the assessment roll and is the basis upon which property tax is distributed among property owners.

***Soil, Environmental & Drainage Conditions***

The subject site was historically used as a metal fabricator for the aerospace industry. The site has been the subject of numerous environmental investigations in the past including Phase I Environmental Site Assessments (ESAs) and subsurface investigations. The site has been investigated for volatile organic compound (VOC) impacted soil, soil gas, and groundwater.

According to the *Subsurface Investigation Report and Human Health Risk Evaluation Former Nardon Manufacturing Corporation Facility,* performed by Hazardous Management Consulting, for California Regional Water Quality Control Board, Los Angeles Region (LARWQCB), dated May 7, 2020, although residual VOCs were discovered beneath the site, these contaminants were not determined to present a risk to human health or present a significant environmental threat. Based on these results, the LACFD issued a no further action (NFA) letter for the site in September 2013 (LACFD, 2013).



26

PROPERTY DESCRIPTION AND ANALYSIS

During investigations at the Former Square D Facility property located immediately west of and hydraulically downgradient from the site, tetrachloroethylene (PCE), trichloroethene (TCE), 1,1-dichloroethene (1,1-DCE), and 1,4-dioxane were discovered in groundwater. Based on these results, the past operations at the site, and the hydraulic direction of the site from this facility, the LARWQCB issued a directive to HPC Vineburn, LLC, current owners of the site, to complete additional site assessment activities to further assess possible sources areas that might be present and possibly contributing to the groundwater issues.  See the report prepared by Hazardous Management Consulting for details with regard to the aforementioned contamination.

According to information submitted, the exact cost to remediate the subject site has not yet been determined. The owner of the subject property has a *Premises Pollution Liability Insurance Policy* issued by Chubb and an *Environmental Insurance Policy* issued by AIG Environmental each of which limited the owner's financial responsibility to remediation costs above $3,000,000. It is an extraordinary assumption that the owner's insurance policies are sufficient to cover all of the economic costs of remediation and there is no economic/financial impact of the contamination on the subject property (no deductions have been made in this appraisal for contamination issues). No warranties are made in this appraisal for the costs associated with environmental issues or the cost associated with remediation. The value conclusions in this appraisal would be impacted if the contamination had an economic impact on the subject property.

### Soil, Environmental & Drainage Conditions - Conclusions

As noted in the *Extraordinary Assumptions*, all of the economic costs associated with remediation of the subject site is assumed to be covered by the owner's insurance policies. Therefore, no deductions have been made for soil contamination in this appraisal.

The quality and load-bearing capacity of the soil is assumed to be adequate for any existing or proposed improvements.  The appraiser makes no warranties with regard to any aspect of the site, to what degree the site is buildable, or the soil quality, as it would be considered beyond the appraiser's expertise and beyond the scope of the appraisal.

Primary drainage on the site is via natural and contrived slope to the streets and by concrete gutters.  Drainage is assumed to be adequate.

### Easements and Encroachments

A title report was not submitted for review.  Based on the subject's legal description and site inspection, there is an non-exclusive easement which provides ingress and egress to the subject property (via Valley Blvd.).  Based upon a review of the subject plat map and visual inspection, there do not appear to be any easements or encroachments that adversely affect the market value of the subject property.



PROPERTY DESCRIPTION AND ANALYSIS

The conclusions in this appraisal assume that there are no adverse easements and/or encroachments which impact the market value of the subject property, or marketability and appeal of the subject property. The client is advised that the appraiser is not a title officer and is not qualified to render opinions as to title. The client is urged to consult a title expert to determine precisely the adequacy of clear title. The appraiser assumes no responsibility for matters of a legal nature affecting the property under appraisement or the title thereto; nor does the appraiser render any opinion as to the title, which is assumed to be good and marketable unless specifically stated otherwise.

The client is advised that no back-up documents pertaining to title report exceptions have been reviewed by the appraiser. Furthermore, CC&Rs were not reviewed, easement locations were not provided to the appraiser and the appraiser has not plotted any easements. The subject has been appraised under the specific limiting condition that it is not negatively impacted by any easements or any other items which may be referenced in an appurtenant title report. The client is advised to consult with its title representative to obtain a clear understanding of any title-related issues that may affect the subject property. The conclusions herein assume that there are no adverse easements, encroachments or issues of title. Further investigation is recommended.

### Site - Conclusions

The subject topography is slightly sloping and is considered to be 100% usable. As noted in the *Extraordinary Assumptions*, all of the economic costs associated with remediation of the subject site is assumed to be covered by the owner's insurance policies. Therefore, no deductions have been made for soil contamination in this appraisal.

Drainage conditions appear suitable for all types of development allowed or specially permitted in this zone. The subject is not in a flood zone. There are no adverse easements or encroachments, which would prohibit development on the site. In addition, there are no known offsite hazards, which would hinder development. The subject is located in an earthquake fault zone. No warranties are made with regard to the earthquake hazards (beyond the scope of the appraisal).

Access and visibility are considered to be good. The orientation of the subject buildings appear to be adequate for access and visibility. The access to the subject is considered to be typical of properties in the area. All necessary utilities for development of the property are installed and are typical for the area. Taking the aforementioned into consideration, the subject site is considered to have adequate functional utility and there were no adverse physical attributes noted.

The subject site conforms well to the immediate area and has good access, visibility, linkages and parking. The site is well suited for its current use. The subject also has a central location. Taking the aforementioned into consideration, continued demand for properties like the subject is anticipated.



*PLAT MAP*





### *ASSESSOR TAX RECORDS*

## Property Detail Report
**For Property Located At :**
**1919 VINEBURN AVE, LOS ANGELES, CA**
**90032-3704**



CoreLogic
RealQuest Professional

| Owner Information | | | Bldg Card: 000 of 004 |
|---|---|---|---|
| Owner Name: | HPC VINEBURN LLC | | |
| Mailing Address: | 18321 VENTURA BLVD STE 980, TARZANA CA 91356-4000 C006 C/O JEFF SELTZER | | |
| Vesting Codes: | / / | | |
| Purchase Principal Data | | | |

| Location Information | | | |
|---|---|---|---|
| Legal Description: | TRACT # 679 LOT COM S 0 23'30" E 35 FT FROM NE COR OF LOT 2 TH S 0 23'30" E 584.57 FT TH S 89 47' W 228.39 FT TH S 0 23'34" E 35.99 FT TH S 89 47' W 168.01 FT TH N 0 23'30" W 656.04 FT TH N 89 47' BEG PART OF LOT 2 | | |
| County: | LOS ANGELES, CA | APN: | 5215-014-005 |
| Census Tract / Block: | 2014.02 / 3 | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | 679 |
| Legal Book/Page: | 17-24 | Map Reference: | 45-C1 / |
| Legal Lot: | 2 | Tract #: | 679 |
| Legal Block: | | School District: | LOS ANGELES |
| Market Area: | 621 | School District Name: | LOS ANGELES |
| Neighbor Code: | | Munic/Township: | L.A. ADELAN |

| Owner Transfer Information | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

| Last Market Sale Information | | | |
|---|---|---|---|
| Recording/Sale Date: | 04/16/2013 / 04/15/2013 | 1st Mtg Amount/Type: | $4,192,000 / CONV |
| Sale Price: | $6,350,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | 564190 |
| Document #: | 564189 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $54.23 |
| New Construction: | | Multi/Split Sale: | MULTIPLE |
| Title Company: | FIRST AMERICAN TITLE INSURANCE | | |
| Lender: | * OTHER INSTITUTIONAL LENDERS | | |
| Seller Name: | MERUELO MADDUX PROPS-1919 VINE | | |

| Prior Sale Information | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 12/16/2005 / 09/15/2005 | Prior Lender: | IMPERIAL CAP BK |
| Prior Sale Price: | $8,100,000 | Prior 1st Mtg Amt/Type: | $5,500,000 / CONV |
| Prior Doc Number: | 3097917 | Prior 1st Mtg Rate/Type: | / FIXED RATE LOAN |
| Prior Deed Type: | GRANT DEED | | |

| Property Characteristics | | | |
|---|---|---|---|
| Year Built / Eff: | 1931 / 1951 | Total Rooms/Offices | Garage Area: |
| Gross Area: | 117,091 | Total Restrooms: | Garage Capacity: |
| Building Area: | 117,091 | Roof Type: | Parking Spaces: |
| Tot Adj Area: | | Roof Material: | Heat Type: | HEATED |
| Above Grade: | | Construction: | BRICK | Air Cond: |
| # of Stories: | 1 | Foundation: | Pool: |
| Other Improvements: | | Exterior wall: | TILT-UP | Quality: |
| | | Basement Area: | Condition: |

| Site Information | | | |
|---|---|---|---|
| Zoning: | LACM | Acres: | 5.76 | County Use: | LIGHT MANUFACTURING (3100) |
| Lot Area: | 250,938 | Lot Width/Depth: | x | State Use: |
| Land Use: | LIGHT INDUSTRIAL | Res/Comm Units: | / | Water Type: |
| Site Influence: | | | Sewer Type: |

| Tax Information | | | |
|---|---|---|---|
| Total Value: | $7,630,021 | Assessed Year: | 2024 | Property Tax: | $110,944.37 |
| Land Value: | $5,357,918 | Improved %: | 30% | Tax Area: | 12703 |
| Improvement Value: | $2,272,103 | Tax Year: | 2024 | Tax Exemption: |
| Total Taxable Value: | $7,630,021 | | |



PROPERTY DESCRIPTION AND ANALYSIS

### *ASSESSOR TAX RECORDS*

## Property Detail Report
**For Property Located At :**
,, CA



| Owner Information | | | |
|---|---|---|---|
| Owner Name: | HPC VINEBURN LLC | | |
| Mailing Address: | 18321 VENTURA BLVD STE 980, TARZANA CA 91356-4000 C006 C/O JEFF SELTZER | | |
| Vesting Codes: | / / | | |
| Purchase Principal Data | | | |

| Location Information | | | |
|---|---|---|---|
| Legal Description: | TRACT # 12524 LOT COM AT MOST S COR OF LOT 35 TH N 0 23'34" W 89.57 FT TH S 75 08'21" E 35.54 FT TH S 22 45' W 87.24 FT TO BEG PART OF LOT 35 | | |
| County: | LOS ANGELES, CA | APN: | 5215-014-006 |
| Census Tract / Block: | / | Alternate APN: | |
| Township-Range-Sect: | | Subdivision: | 12524 |
| Legal Book/Page: | 236-5 | Map Reference: | 45-C1 / |
| Legal Lot: | 35 | Tract #: | 12524 |
| Legal Block: | | School District: | LOS ANGELES |
| Market Area: | 621 | School District Name: | LOS ANGELES |
| Neighbor Code: | | Munic/Township: | L.A. ADELAN |

| Owner Transfer Information | | | |
|---|---|---|---|
| Recording/Sale Date: | / | Deed Type: | |
| Sale Price: | | 1st Mtg Document #: | |
| Document #: | | | |

| Last Market Sale Information | | | |
|---|---|---|---|
| Recording/Sale Date: | 04/16/2013 / 04/15/2013 | 1st Mtg Amount/Type: | $4,192,000 / CONV |
| Sale Price: | $6,350,000 | 1st Mtg Int. Rate/Type: | / |
| Sale Type: | FULL | 1st Mtg Document #: | 564190 |
| Document #: | 564189 | 2nd Mtg Amount/Type: | / |
| Deed Type: | GRANT DEED | 2nd Mtg Int. Rate/Type: | / |
| Transfer Document #: | | Price Per SqFt: | $4,409.72 |
| New Construction: | | Multi/Split Sale: | MULTI |
| Title Company: | FIRST AMERICAN TITLE INSURANCE | | |
| Lender: | * OTHER INSTITUTIONAL LENDERS | | |
| Seller Name: | MERUELO MADDUX PROPS-1919 VINE | | |

| Prior Sale Information | | | |
|---|---|---|---|
| Prior Rec/Sale Date: | 12/16/2005 / 09/15/2005 | Prior Lender: | IMPERIAL CAP BK |
| Prior Sale Price: | $8,100,000 | Prior 1st Mtg Amt/Type: | $5,500,000 / CONV |
| Prior Doc Number: | 3097917 | Prior 1st Mtg Rate/Type: | / FIXED RATE LOAN |
| Prior Deed Type: | GRANT DEED | | |

| Property Characteristics | | | |
|---|---|---|---|
| Year Built / Eff: | 1965 / 1965 | Total Rooms/Offices | Garage Area: |
| Gross Area: | 1,440 | Total Restrooms: | Garage Capacity: |
| Building Area: | 1,440 | Roof Type: | Parking Spaces: |
| Tot Adj Area: | | Roof Material: | Heat Type: |
| Above Grade: | | Construction: | Air Cond: |
| # of Stories: | | Foundation: | Pool: |
| Other Improvements: | | Exterior wall: | Quality: |
| | | Basement Area: | Condition: |

| Site Information | | | |
|---|---|---|---|
| Zoning: | LAR1 | Acres: | 0.04 | County Use: | PARKING LOT (2700) |
| Lot Area: | 1,623 | Lot Width/Depth: | x | State Use: | |
| Land Use: | PARKING LOT | Res/Comm Units: | / | Water Type: | |
| Site Influence: | | | | Sewer Type: | |

| Tax Information | | | |
|---|---|---|---|
| Total Value: | $36,210 | Assessed Year: | 2024 | Property Tax: | $507.39 |
| Land Value: | $33,799 | Improved %: | 7% | Tax Area: | 12703 |
| Improvement Value: | $2,411 | Tax Year: | 2024 | Tax Exemption: | |
| Total Taxable Value: | $36,210 | | | | |



## PROPERTY DESCRIPTION

The subject is improved with a large single-tenant industrial building, small warehouse building and small storage building (see site plan on the following page).  According to CoStar, the subject buildings total 122,345 sq. ft., which is larger than the square footage reported in RealQuest (117,091 sq. ft.).  According to the historic marketing brochure the buildings total 123,411 sq. ft., which is the same as the square footage reported in the lease (123,411 sq. ft.). For the purpose of this appraisal, we have relied on the square footage reported in the historic marketing brochure and the lease, as this is the square footage which has historically been utilized to market the property for sale and to lease the subject property.  However, no warranties are made with regard to the exact square footage of the subject buildings.

| | |
|---|---|
| Total Gross Building Area: | +/- 123,411 sq. ft. |
| Year Built: | 1931, 1950 and 1984 |
| Renovated: | 1984 |
| Construction: | Primarily concrete tilt-up |
| Clear Height: | 12 – 20 feet |
| Office Area: | +/- 17,000 sq. ft. (13.8% of GBA) |
| Fire Sprinklers: | Yes |
| Power: | 3,000 amp, 480 volt |
| Loading Doors: | 3 dock high, 6 ground level |
| Parking: | +/- 250 spaces (2.03 per 1,000 sq. ft.) |

The subject is leased to ReadySpaces LA Downtown. ReadySpaces has delineated the subject building into numerous smaller units and subleases these units (ranging from 100 to 5,000 square feet).  No value was given to the tenant improvements.

The subject buildings are well maintained with no functional inadequacies.  The property is considered to be of average quality in average overall condition.  The effective age is estimated at 25 years, with an estimated remaining economic life of 30 years.  There were no unfavorable factors noted.



PROPERTY DESCRIPTION AND ANALYSIS

**Site Plan**



<u>MARKET ANALYSIS</u>

### *AREA LOCATION MAP*





<u>MARKET ANALYSIS</u>

### *MARKET CONDITIONS AND TRENDS*

**General Area**

The subject property is located in the community of El Sereno in the central portion of Los Angeles County. This Metropolitan Area is the second largest urban area in the United States behind New York and its environs.  Long recognized as the West Coast's most important trade and cultural center, the Greater Los Angeles area has historically enjoyed a strong and diverse economic base, largely due to factors such as location, excellent freeway system, diversified employment base, scenic environment and temperate climate.  Additionally, trade has been strong with Pacific Rim countries such as Japan, China, Korea and Taiwan.

Los Angeles is the principal city of the metropolitan area.  Los Angeles was originally founded in 1781 and the City now has an estimated population of 3.7 million within its 470 square miles.  The City presently makes up 11.5% of Los Angeles County in terms of territory and 39% in regard to population.

The pleasant Southern California climate and diversified job opportunities have traditionally attracted people into the area from various parts of the United States.  Numerous suburbs lacking a strong central focus characterize land use pattern in the Los Angeles area.  Several of these outlying locations have developed strong identities with their own business centers.  This is particularly true with reference to the older established communities of Glendale, Pasadena, Burbank, Westwood, etc.; however, strong urban concentrations have also come into being in locations historically lacking in identity.  Century City, the Los Angeles International Airport area and Warner Center in Woodland Hills are examples.

**Geographical and Physical Factors**

Los Angeles County is located in the southwestern portion of the State of California.  Kern County bounds it on the north on the east by San Bernardino County, on the southeast by Orange County, on the southwest and west by the Pacific Ocean, and on the west and northwest by Ventura County.  The terrain of Los Angeles County is quite varied, extending from a broad coastal plain inland to mountain ranges, which are separated by interior valleys.  The broad coastal plain is locally known as the Los Angeles Basin.  The interior valleys are the San Fernando Valley, the San Gabriel Valley, the Pomona Valley, and the Antelope Valley.  The County of Los Angeles contains approximately 4,083 square miles.  The City of Los Angeles is located in the western and northwestern portion of Los Angeles County and as noted above, contains +/- 470 square miles.  Most of the city land is contained in the Los Angeles Basin and the San Fernando Valley.

The City serves as a commercial, industrial and cultural center for the nearby suburban communities.  Los Angeles and other nearby cities and counties are linked by a regional freeway system, the most extensive in the world.  These freeways radiate from a loop around the



MARKET ANALYSIS

Central City, providing convenient access from all points of the metropolitan area.  Major mountain ranges include the San Gabriel Mountains, the Santa Monica Mountains, the Santa Susana Mountains, and the Puente Hills.

**Population**

The table below summarizes population growth trends for the City and the County.  The statistical information was compiled from the U.S. Census Bureau and data published by the State of California Department of Finance.

**Los Angeles City and County Population Trends Since 1980**

| Year | City of Los Angeles | County of Los Angeles |
|------|---------------------|-----------------------|
| 1980 | 2,968,579 | 7,477,517 |
| 1990 | 3,485,398 | 8,863,164 |
| 2000 | 3,694,820 | 9,519,338 |
| 2010 | 3,792,621 | 9,818,605 |
| 2020 | 3,898,747 | 10,014,009 |

*Source: U.S. Census and California Department of Finance*

Rapid population growth was experienced during the 1960s when many of the communities within the county were in their initial growth stages.  Population growth slowed down during the 1970s but picked up substantially during the 1980s largely due to the strong economy that was heavily based on defense contracts of Southern California's aerospace industry.  The end of the Cold War caused severe attrition in defense and aerospace industry related jobs.  In the 1990s, together with economic setbacks and mounting unemployment, there was a reversal in the net immigration pattern.  Whereas formerly Los Angeles County had been gaining about 124,000 persons per year, statistics indicate a net outflow of 190,000 per year.  Nearly one million more people left Los Angeles than came here from other parts of the United States in the five-year period between 1990 and 1995, according to U.S. Census Bureau statistics.  This outflow of population was offset by 600,000 foreigners migrating to Los Angeles County during the same period, and that is legal immigration only.

**Employment and Economic Conditions**

The State of California has one of the most dynamic economies in the world.  California is renowned as the leader in aerospace and engineering, trendsetter in entertainment and the arts, a trading hub of the Pacific region, and the center for manufacturing, services, retailing and international trade in the Western United States.  Los Angeles County is the top-ranked county in manufacturing in the United States, producing more than 10% of the nation's production of such diverse items as aircraft, aircraft equipment, aluminum, dental equipment, games and toys, gas transmissions and distribution equipment, guided missiles, space vehicles



36

MARKET ANALYSIS

and propulsion units, and women's apparel. Fueled by trade with the Pacific Rim countries, the Port of Los Angeles/Long Beach ranks first in the nation in volume. Los Angeles County is also home to the film, television and recording industries.

**Summary**

Los Angeles is not a city in the usual sense of a concentrated urban center; rather it is a collection of intermingling communities with individual identities. Physically developed as an independent community, the City was engulfed by a regional population surge accompanying its urbanization following World War II. As with many other metropolitan cities in Southern California, surrounding communities are largely only distinguishable by the municipal signing that forms its boundaries. Historically, the economic base for the Los Angeles area had been the oil industry, the entertainment industry, aerospace/defense and agriculture. The Los Angeles and Long Beach harbors have expanded their capacity and are currently the leading ports on the West Coast for import and export commerce. In connection with the increased import/export commerce, Los Angeles has become a major distribution center.



37

MARKET ANALYSIS

**Economic Conditions – Los Angeles**

As the second largest metro in the nation, Los Angeles' economy is vast and diverse, with concentrations in entertainment, tourism, international trade, fashion, and aerospace industries. An abundance of creative workers and entrepreneurship is conducive to business formation and higher self-employment levels. The demographics are diverse in racial and ethnic composition, educational attainment, income, and wealth. L.A. has several major talent generators, including top-tier universities such as USC, UCLA, and Cal. Tech.

Outmigration has been a significant headwind to economic growth, making it one of the slower-growing metros nationally. Over the past five years, the population has declined by over 3%, with over 300,000 fewer people. Residents across all income bands have migrated to cheaper metros, especially in the Sun Belt. Continued outmigration continues to be a headwind to the economy. The most recent census data showed slight growth over the past year; however, the population has declined by 3.3% over the past five years, with around 340,000 fewer people. Many lower and middle income residents have migrated to cheaper metros, especially in the Sun Belt.

Disputes between workers and employers have arisen in recent years across various industries, including writers and actors in entertainment, dockworkers and delivery drivers in transportation, and hotel staff in hospitality. Los Angeles' high cost of living exacerbates labor disputes and motivates outmigration, with the median listing price for homes in Los Angeles County over $1 million and some of the highest apartment rents nationally. The metro is among the least affordable nationally and globally based on home-price-to-income ratios.

Some higher-paying, office-using sectors like tech and media have seen modest gains over the past year, but total employment in these sectors is still down around 25% from a peak in 2022. Entertainment employment has been slow to rebound from the actors' and writers' strikes of 2023. L.A.'s entertainment sector faces increased competition from more cost-effective locations worldwide, including Atlanta, New York, and Toronto. The entertainment sector, directly and indirectly, accounts for around a fifth of the metro's total economic output.

The transportation sector is another critical economic anchor. Much of the demand is drawn from the ports of Los Angeles and Long Beach, which combined represent the largest port complex in the country, handling around a quarter of container ships in the nation. The ports and the 20 million residents in Greater Southern California are key reasons the region is one of the largest industrial markets in the United States. Traffic at the ports rose in 2024 after losses in 2023. However, President Trump's use of tariffs against trade partners has injected uncertainty into the transportation sector. Trade flows could decline in the near term, softening transportation employment and restraining demand for industrial space.

With 50 million visitors a year, tourism is important for the local economy, stimulating nearly $35 billion in the local business community and supporting over a half million jobs, according to the Los Angeles Tourism & Convention Board. Stores, restaurants, and lodging in tourist



38

Case 1:25-bk-11455-MB    Doc 45-1    Filed 09/19/25    Entered 09/19/25 16:47:16    Desc
Declaration of Jeffrey Seltzer    Page 50 of 81

MARKET ANALYSIS

hotspots like Downtown L.A., Hollywood, Beverly Hills, and Santa Monica depend on visitor spending. The number of tourists visiting has recovered from the lows during the pandemic. However, international visitors, who typically spend significantly more than domestic tourists, have yet to return fully, especially from Asia.

The wildfires in January 2025 represent one of the costliest national disasters in U.S. history. The resulting devastation will create economic headwinds for years in what is likely to be a drawn-out rebuilding process. A report commissioned by the Southern California Leadership Council and LA County Economic Development Corporation estimated property losses between $28 and $54 billion. Additionally, the fires could lead to billions in labor income reductions, significant losses in tax revenue, and business disruptions. The pace of rebuilding will be a critical determinant of the extent of economic losses.


**Central Los Angeles – Industrial Submarket – YTD 2nd Quarter 2025**

According to Industrial Submarket Report – Central Los Angeles – YTD 2nd Quarter 2025, published by CoStar, Industrial occupancy in Central Los Angeles has contracted over the past two decades, with the area undergoing significant redevelopment for housing purposes. This redevelopment has led to the demolition of over 11 million SF of industrial space, paving the way for the construction of 40,000 housing units, 5 million SF of creative office space, and 3.5 million SF of modern logistics inventory.

Despite a shrinking inventory base, Downtown Los Angeles and its nearby industrial areas still host a dense concentration of manufacturing companies and logistics operators. These businesses benefit from convenient access to cargo coming in from Los Angeles and Long Beach ports via the Alameda Corridor, a vital 20-mile freight rail expressway.

However, due to a pullback in U.S. business inventories and a labor strike at West Coast ports in 2023, cargo imports to L.A. remained below mid-pandemic highs until the summer of 2024, leading distributors to shed space. Additionally, inflation pressures contributed to losses in occupancy, particularly in specialized manufacturing buildings. As a result of weaker demand, vacancy in the submarket has expanded by over 200 basis points since the beginning of 2022, to 5.8% as of the second quarter of 2025.

Asking rents for industrial space in Los Angeles have fallen approximately 20% from recent peaks, and concessions are elevated due to rising vacancy. However, rent growth in the market outpaced the national average through the 2010s economic expansion cycle due to compressed availability and high barriers to development, a trend that endures in the long-term forecast. Tenant demand could improve due to a rise in e-commerce sales growth, further rebound in imports to Southern California, and tamer inflation.



39

MARKET ANALYSIS

**Leasing**

Many tenants in Central Los Angeles have downsized in recent years as fewer containers were shipped through Los Angeles and Long Beach ports. Net absorption over the trailing year measures -190,000 SF. Vacancy has increased from under 4% before the pandemic, to 5.8%.

Modern logistics firms often face challenges in finding suitable space in the area as much of the supply in the area is old, small, and low quality. This limitation restricts tenant interest primarily to smaller manufacturing and distribution operations. The majority of industrial space in the submarket consists of 1 & 2 Star buildings smaller than 10,000 SF. Given the dense population in Central Los Angeles, the largest tenants tend to be public storage operators and third-party logistics companies that support last-mile distribution.

**Sales**

Industrial sales volume in Vernon fell from a record $760 million in 2022 to $317 million in 2023, and just $45 million traded in the first half of 2024. Historically, institutional investors and REITs account for 20% of acquisition volume in Vernon, although a smaller share more recently as lending has been constrained. Owner-occupiers of closed businesses are disposing of assets. Users account for 40% of seller volume over the past three years, compared to 30% of buyer volume.  Rent potential is falling as vacancy rises, but robust market rent growth leading into 2022 is still providing investors with mark-to-market opportunities. Valuations are under pressure as rents decline, but more so from rising cap rates, which have expanded by more than 100 basis points into the mid-5% range across Southern California.

**Rent**

Rents for industrial space in Los Angeles have decreased since mid-2023 due to contracting demand and rising vacancy. Weighted average asking rents are down approximately 20% from their peak. Lease concessions, which were nearly nonexistent two years ago, have become common. Some landlords are now offering four to five months of free rent on a five-year lease deal, and market participants have noted that effective rents are down as much as 25% depending on building subtype, size, vintage, and location. However, following a downturn this year, rents are forecast to rise in 2025 as more robust demand and a slowdown in completions prevent vacancies from climbing higher.

Central Los Angeles' proximity to the businesses and residents in Downtown LA, as well as the twin ports, attracts tenants willing to pay a modest premium. Industrial rents in Central Los Angeles average $19.90/SF, above the metro average of $17.80/SF. However, much of the submarket's inventory is aged and does not have the amenities necessary to attract modern logistics firms. Rents can range widely across the submarket due to location and quality.



MARKET ANALYSIS

**Sales**

Transaction activity in Central Los Angeles remains subdued. Investors pushed deals ahead of the enactment of the ULA transfer tax, which increased transaction costs, closing 80% of 2023's sales volume in the first quarter. Over $450 million was traded in 2023, but only $218 million was traded in 2024.

Despite its current downward trajectory, robust market rent growth leading into 2022 is still providing investors with mark-to-market opportunities and capital gains for sellers. For example, Fortress Investment Group acquired 320-336 W 31st St., a 73,600 SF building, in May 2021 for $22 million and sold it to Planned Parenthood for $37.9 million, or $514/SF in March 2024. The new owner-user is planning to expand its footprint and headquarters.



41

<u>MARKET ANALYSIS</u>

**Neighborhood/Immediate Surroundings**

The subject is located in the El Sereno neighborhood.  El Sereno is one of the oldest communities in LA, dating back to the early 1900s, and sits nestled between Lincoln Heights, Alhambra, and South Pasadena. This area is situated in the eastern part of Los Angeles, and is close to the I-10 and I-710 freeways.

El Sereno is 4.17 square miles and has a population of 43,766. It has a population density of 9,826 people per square mile, which is about average for the City of Los Angeles. The neighboring communities are University Hills, Boyle Heights, East Los Angeles, Lincoln Heights, Montecito Heights, Highland Park, and the cities of Alhambra, Monterey Park and South Pasadena.  El Sereno is a predominantly residential neighborhood known for its diverse community and proximity to downtown Los Angeles.

Demographics in the immediate area are as follows:

|  | 1 mile | 3 miles |
|---|---|---|
| Population | 25,344 | 273,572 |
| Households | 7,213 | 83,129 |
| Median Age | 36 | 37.10 |
| Median HH Income | $59,584 | $63,814 |
| Daytime Employees | 13,568 | 119,613 |

The subject is proximate to necessary support facilities and has convenient access to major freeways like the I-5, I-10, and I-710, making it an ideal location for businesses requiring proximity to downtown LA and surrounding areas.  The subject is proximate to Los Angeles General Medical Center (formerly known as Los Angeles County-USC Medical Center). Los Angeles General Medical Center is a 600-bed public teaching hospital located at 2051 Marengo Street in the Boyle Heights neighborhood of Los Angeles, California, and one of the largest academic medical centers in the United States. The hospital facility is owned by Los Angeles County and operated by the Los Angeles County Department of Health Services.  The subject is also proximate to Cal State Los Angeles. The subject's proximity to Los Angeles General Medical Center and Cal State Los Angeles enhance its redevelopment appeal.

The subject has access along Valley Blvd., which has good commercial traffic (ADT 22,748, 2025 est.).  The subject also has access along Vineburn Ave., which is a lightly traveled street. Property uses along the east side of the street are single-family residences.

Appeal in the area has remained strong, as evidenced by the low vacancy.  The subject has a central location and is proximate to recreational facilities, employment centers, transportation and employment.  The area exhibits aspects for a continued demand for real estate with a positive impact on the subject property.  The subject use conforms to the immediate area. Appeal and marketability are good.  No unfavorable factors were noted.



42

VALUATION PROCESS

### APPRAISAL METHODOLOGY

#### Introduction

Our valuation process involves the three traditional methods of valuation in the appraisal of real estate.   These three traditional approaches to value are:

- **The Cost Approach**

- **The Income Approach**

- **The Sales Comparison Approach**

Included in each approach are the contributing value analyses of the real estate and site improvements.  Further description and scope of each of the three approaches follows.

#### The Cost Approach

This approach utilizes the subject's land value, which is added to the depreciated replacement cost of the improvements to arrive at an indication of value for the overall property.  This approach is particularly useful in the valuation of properties that are either new or proposed. Its relevance is based largely on the principal of *substitution*, which implies that a purchaser will typically pay no more for a property than it would cost to find a similar site and replace the subject improvements on the alternative site.   However, the Cost Approach loses some relevance when dealing with older properties if market-derived estimates of depreciation are not possible.

Since the Cost Approach requires estimates of depreciation, which introduces a degree of uncertainty into the analysis, the Cost Approach is not an accurate indicator of market trend in the current economic climate.   Therefore, the Cost Approach was not determined to be a reliable indicator of market value and was not performed.

#### The Sales Comparison Approach

This approach involves comparing the subject property to other properties of similar size, location and utility, which have sold recently.  A search was performed for sales of properties similar to the subject and five sales were found.  It was necessary to analyze the various possible unit values of comparison.  Using physical units of comparison such as price per square foot was found to be a reliable indicator and is appropriate with this type of property.

Overall, our use of the Sales Comparison Approach included a degree of assumptions that were consistent with the other approaches.   We have specific real estate values, which were helpful



43

VALUATION PROCESS

in isolating a value range.  Since good sale comparables were found, this approach offers support to the Income Approach and is considered to be a reliable indicator of value.


***The Income Approach***

This approach involves the conversion of net operating income into an indication of value via a process of capitalization, which involves capitalizing the net operating income stream with an overall capitalization rate.

This approach is based heavily on the principle of *anticipation* which is defined as the perception that value is created by the expectation of benefits or return on and of original investment over a specific holding period.  This approach is highly relevant in the analysis of leased fee properties since they are invariably analyzed and purchased as investments on the basis of their proven operation and continued income generating potential.  As such, the market value is generally dictated by the net operating income a property can generate including capital costs of real estate and tangible assets, and a reasonable entrepreneurial/ownership profit.

Typical investment real estate properties and improvements are owner/occupied and leased.  Good lease comparables are available in the subject area and analysis of the subject's current and historical operations, income and expenses, provides a reliable indicator of value.



44

Case 1:25-bk-11455-MB    Doc 45-1    Filed 09/19/25    Entered 09/19/25 16:47:16    Desc
Declaration of Jeffrey Seltzer    Page 56 of 81

COST APPROACH

### *COST APPROACH*

The employment of the Cost Approach in the valuation process is based upon the principle of substitution. The principle affirms that no prudent investor would pay more for property than the amount for which a site can be acquired and for which improvements that have equal desirability and utility can be constructed without undue delay. Consequently, the reproduction cost or the replacement cost on the date of the appraisal plus the site value provides a measure by which an already improved property can be judged. The Cost Approach normally consists of five steps:

1.  Estimate of land value as if vacant;

2.  Estimate of the current cost of replacing or reproducing the improvements;

3.  Estimate and deduction of any major causes of depreciation;

    a)  physical deterioration, consisting of two major elements:
        items of curable deterioration and items that are incurable;

    b)  functional obsolescence: incurable and curable;

    c)  external obsolescence.

4.  Addition of the value of land to the depreciated value of the improvements; and

5.  If appropriate, an allowance for entrepreneurial profit.


The Cost Approach was not relied upon for the following reasons:

- The subject area is fully built up and there were not good comparable land sales;
- The subject improvements are over 40 years old. This tends to diminish the reliability and accuracy of estimating accrued depreciation;
- Market participants rely primarily on the Sales Comparison and Income Approaches to value



45

Case 1:25-bk-11455-MB    Doc 45-1    Filed 09/19/25    Entered 09/19/25 16:47:16    Desc
Declaration of Jeffrey Seltzer    Page 57 of 81

SALES COMPARISON APPROACH

### SALES COMPARISON APPROACH

*Introduction*

The Sales Comparison Approach is essential in almost every real estate appraisal.  The value estimated by this approach frequently is defined as:

*"The price at which a willing seller would sell and a willing buyer would buy, neither being under abnormal pressure."*

This definition assumes that both buyer and seller are fully informed as to the property and state of the market for that type of property, and that the property has been exposed in the open market for a reasonable amount of time.

In the Sales Comparison Approach to value an attempt is made to locate and analyze recent sales of properties similar to the subject in terms of physical, locational, and economic characteristics.  Inherent in this approach is the principle of substitution, which holds that a typical purchaser will pay no more for a property than the cost of acquiring an equal substitute.

Adjustments for major differences are made to comparable sales such that the resulting adjusted market price of each is an indication of value for the subject.  Units of comparison such as the price per square foot of improvements are abstracted from the adjusted market prices of the comparable sale properties, which are then correlated and applied to the subject property to arrive at an estimate of value based directly upon the market.

<u>Cash Equivalency</u>

Except where noted, cash equivalency analyses were not considered appropriate with the sales data employed in the report.  Said market data reflects typical current market conditions.  In those cases where it was not possible to verify comparable financing data, the sales were assumed to be typical market transactions.



46

SALES COMPARISON APPROACH

*Sale Comparables*

In order to estimate the current market value of the subject property as an industrial property, a search was conducted throughout the subject submarket and competing submarkets for similar types of properties. The most meaningful unit of comparison in this approach to value is determined to be the price per square foot (based upon the gross building area). The sales believed to be most meaningful to the analysis of the subject property are summarized below. A complete description of each of the comparables utilized in the analysis follows.

| Comp | Address<br><br>*Proximity* | Sale Price<br>*Sale Date* | Type<br>*Use*<br>*Construction* | Bldng SF<br>*Site Size*<br>*FAR* | Year Built<br>*Location*<br>*Condition*<br>*Quality*<br>*Appeal* | $/SF<br>*Cap Rate* |
|---|---|---|---|---|---|---|
| 1 | 2435 E. 37th St.<br>Los Angeles<br><br><br>*4.5 miles southwest* | $17,500,000<br>*02/03/25* | Industrial<br>*Single-tenant* | 86,032 SF<br>*132,422 SF*<br>*.65* | 1947<br>*Similar*<br>*Similar*<br>*Similar*<br>*Similar* | $203.41<br>*N/A* |
| 2 | 4520 Maywood Ave.<br>Los Angeles<br><br><br>*4.5 miles south* | $10,250,000<br>*10/29/24* | Industrial<br>*Single-tenant* | 47,000 SF<br>*77,537 SF*<br>*.61* | 1929<br>*Similar*<br>*Inferior*<br>*Similar*<br>*Similar* | $218.09<br>*N/A* |
| 3 | 12301 Woodruff Ave.<br>Los Angeles<br><br><br>*10 miles south* | $7,050,000<br>*06/17/24* | Industrial<br>*Multi-tenant* | 30,800 SF<br>*80,325 SF*<br>*.38* | 1962<br>*Similar*<br>*Similar*<br>*Similar*<br>*Similar* | $228.90<br>*4.30%* |
| 4 | 3001 W. Mission Rd.<br>Alhambra<br><br><br>*2 miles northeast* | $9,500,000<br>*06/28/23* | Industrial<br>*Multi-tenant* | 53,672 SF<br>*73,181 SF*<br>*.73* | 1956/1988<br>*Similar*<br>*Similar*<br>*Similar*<br>*Similar* | $177.00<br>*4.94%* |
| 5 | 3333 S. Grand Ave.<br>Los Angeles<br><br><br>*5.75 miles southwest* | $21,000,000<br>*03/31/23* | Industrial<br>*Single-tenant* | 102,150 SF<br>*122,935 SF*<br>*.83* | 1986<br>*Similar*<br>*Similar*<br>*Similar*<br>*Similar* | $205.58<br>*4.50%* |



47

SALES COMPARISON APPROACH

### *LOCATION MAP – SALE COMPARABLES*





SALES COMPARISON APPROACH

*Sale Comp # 1*



*Sale Comp # 2*





49

<u>SALES COMPARISON APPROACH</u>

*Sale Comp # 3*



*Sale Comp # 4*





50

SALES COMPARISON APPROACH

*Sale Comp # 5*





SALES COMPARISON APPROACH

### SALE COMPARABLES – ADJUSTMENT GRID

| Address | Subject 1919 Vineburn Ave. Los Angeles 5215-014-005, 006 | Comp # 1 2435 E. 37th St. Los Angeles 6302-005-021 | Comp # 2 4520 Maywood Ave. Los Angeles 6304-022-049 | Comp # 3 12301 Woodruff Ave. Downey 6283-013-025 | Comp # 4 3001 W. Mission Rd. Alhambra 5342-034-015 | Comp # 5 3333 S. Grand Ave. Los Angeles 5122-020-026 |
|---|---|---|---|---|---|---|
| Sale Date | | 02/03/25 | 10/29/24 | 06/17/24 | 06/28/23 | 03/31/23 |
| Sale Price | | $17,500,000 | $10,250,000 | $7,050,000 | $9,500,000 | $21,000,000 |
| Doc # | | 0066078 | 0747175 | 6758634 | 6437891 | 6356948 |
| Buyer | | Konoike-Pacific CA | OLAM 4520 Maywood | SGV LLC | Alhambra SS Invest. | SL La Development |
| Seller | | Triple-S Steel Hldng | Palm Prop. Invest. | Lund Roberton Ltd | Chueng Living Tr. | Kobb Realty LLC |
| Prop. Rights | | Fee simple | Fee simple | Leased fee | Leased fee | Leased fee |
| Building SF | 123,411 SF | 86,032 SF | 47,000 SF | 30,800 SF | 53,672 SF | 102,150 SF |
| Yr Blt | 1931/1950/1984 | 1947 | 1929 | 1962 | 1956/1988 | 1986 |
| Construction | Concrete Tilt | Concrete Tilt | Concrete Tilt | Concrete Tilt | Concrete Tilt | Concrete Tilt |
| Use | Industrial | Industrial | Industrial | Industrial | Industrial | Industrial |
| | *Single-tenant* | *Single-tenant* | *Single-tenant* | *Multi-tenant* | *Multi-tenant* | *Single-tenant* |
| Clearance | *12′ – 20′* | *N/Av* | *20′* | *N/Av* | *20′* | *26′* |
| Office % | 13.8% | *N/Av* | *N/Av* | *N/Av* | *N/Av* | *N/Av* |
| Land Area | 252,561 SF | 132,422 SF | 77,537 SF | 80,325 SF | 73,181 SF | 122,935 SF |
| FAR | .49 | .65 | .61 | .38 | .73 | .83 |
| Parking Ratio | 2.02:1,000 SF | N/Av | N/Av | N/Av | N/Av | N/Av |
| Location | Average | Similar | Similar | Similar | Similar | Similar |
| Eff. Age/Cond. | Average | Similar | Inferior | Similar | Similar | Similar |
| Quality | Average | Similar | Similar | Similar | Similar | Similar |
| Appeal | Average | Similar | Similar | Similar | Similar | Similar |
| Cap Rate | N/A | N/A | N/A | 4.30% | 4.94% | 4.50% |
| Unadj. $/SF | | $  203.41 | $  218.09 | $  228.90 | $  177.00 | $  205.58 |
| Prop. Rights | | 0% | 0% | 0% | 0% | 0% |
| Subtotal | | 203.41 | 218.09 | 228.90 | 177.00 | 205.58 |
| Financing | | 0% | 0% | 0% | 0% | 0% |
| Subtotal | | 203.41 | 218.09 | 228.90 | 177.00 | 205.58 |
| Cond. of Sale | | 0% | 0% | 0% | 0% | 0% |
| Subtotal | | 203.41 | 218.09 | 228.90 | 177.00 | 205.58 |
| Market Cond. | | 0% | 0% | 0% | 0% | 0% |
| Subtotal | | $  203.41 | $  218.09 | $  228.90 | $  177.00 | $  205.58 |
| Other Adj. | | | | | | |
| Location | | 0% | 0% | 0% | 0% | 0% |
| Bldng Size | | -2.5% | -7.5% | -10% | -7.5% | 0% |
| Office % | | 0% | 0% | 0% | 0% | 0% |
| Clearance | | 0% | 0% | 0% | 0% | -2.5% |
| FAR | | +5% | +5% | -5% | +7.5% | +10% |
| Eff. Age/Cond. | | 0% | +2.5% | 0% | 0% | 0% |
| Quality | | 0% | 0% | 0% | 0% | 0% |
| Appeal | | 0% | 0% | 0% | 0% | 0% |
| Total Net Adj. | | +2.5% | 0% | -15% | 0% | +7.5% |
| Adj. $/SF | | $  208.50 | $  218.09 | $  194.57 | $  177.00 | $  221.00 |



52

SALES COMPARISON APPROACH

**Sales Comparison Approach – Comments and Conclusions**

The subject's competing market area was searched for comparable industrial properties. The comps utilized were considered to be the best and most recent comps in the subject's competing market area. The overall price per square foot is considered to be the best indicator of market value in this approach and was given sole consideration.

No adjustments for condition of sale or financing were considered to be warranted. The comparables have not sold within 18 months prior to their respective sale dates. Sale price is predicated on real property interest conveyed. The subject is being valued on a leased fee basis. All of the comparables were purchased on a similar fee simple or leased fee basis.

In making time adjustments, we considered changes in the demand for industrial properties in the subject's competing market area, as well as the overall state of the local economy. After all other adjustments, there is no significant evidence that market adjustments are warranted (industrial market values have been stable in the +/- 2 years preceding the effective date of valuation).

Included on the previous page is the improved sales adjustment grid for the comparables sales utilized in this analysis. The comparable sales represent selling prices from $177.00 to $228.90 per square foot (net rentable area) before adjustments. All of the comps are considered to be similar to the subject in linkages and overall location. All of the comps are considered to be similar to the subject in quality and appeal. Although there were differences between the subject and the comps in parking ratio, no adjustments were determined to be warranted (however adjustments for floor area have been made). Adjustments were based on the following analysis:

**Building SF**

Although comp # 5 is slightly smaller than the subject in building size, no adjustment was determined to be warranted. However, comps # 1, # 2, # 3 and # 4 are considered to be significantly smaller than the subject in building size (adjustments range from -2.5% to -10%).

**Clearance**

Although there were differences between the subject and comps # 1, # 2, # 3 and # 4 in clearance, no adjustments were determined to be warranted. However, comp # 5 is considered to be significantly superior to the subject in clearance (adjusted -2.5%).

**Floor Area Ratio (FAR)**

Comp # 3 is superior to the subject in floor area ratio (adjusted -5%). Comps # 1, # 2, # 4 and # 5 are inferior to the subject in floor area ratio (adjustments range from +5% to +10%).



53

SALES COMPARISON APPROACH

**Effective Age/Condition:**

Comps # 1, # 3, # 4 and # 5 are considered to be similar to the subject in effective age/condition.  Comp # 2 is considered to be inferior to the subject in effective age/condition (adjusted +2.5%).

After adjustments, the comps range from $177.00 to $221.00, with a mean of $203.83.   Taking the aforementioned into consideration and giving equal emphasis to all five sales after adjustments, the indicated price per sq. ft. for the subject is determined to be $205.00 per sq. ft.   Concluding at $205.00 per square foot (GBA), the indication of value from the sales comparison approach is rounded to **$25,300,000** (123,411 sq. ft. X  $205.00 per sq. ft.).



54

INCOME APPROACH

### Income Capitalization Approach

In the income approach, the present value of the future benefits of property ownership is measured. A property's income and resale value upon reversion may be capitalized into a current, lump-sum value. There are two methods of income capitalization: direct capitalization and yield capitalization. In direct capitalization, the relationship between one year's income and value is reflected in either a capitalization rate or an income multiplier. In yield capitalization, the relationship between several years' stabilized income and a reversionary value at the end of a designated period is reflected in a yield rate. The most common application of yield capitalization is discounted cash flow analysis.

In this appraisal report, the direct capitalization method of income capitalization was used. In direct capitalization, a single year's net operating income is divided by an overall capitalization rate to arrive at an indication of value. The general formula for the income approach is as follows:

1. Estimate the potential gross income (PGI).

2. Estimate the vacancy and collection loss.

3. Subtract the vacancy and collection loss from the potential gross income to derive the effective gross income.

4. Estimate the total operating expenses for the subject and deduct them from the effective gross income to derive net operating income *(IO)*.

5. Estimate an overall capitalization rate *(RO)*.

6. Divide the net operating income by the overall capitalization rate to derive a value indication by the income capitalization approach.

Definitions that may be used in the income capitalization approach analysis are as follows:

**Direct capitalization***. A method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor. Direct capitalization employs capitalization rates and multipliers extracted or developed from market data. Only a single year's income is used. Yield and value changes are implied but not identified.*

**Income capitalization approach.** *A set of procedures through which an appraiser derives a value indication for an income-producing property by converting its anticipated benefits (cash flows and reversion) into property value. This conversion can be accomplished in two ways. One year's income expectancy can be capitalized at a market-derived capitalization rate or at a capitalization rate that reflects a specified income pattern, return on investment, and change in*



55

INCOME APPROACH

*the value of the investment. Alternatively, the annual cash flows for the holding period and the reversion can be discounted at a specified yield rate.*

**Net operating income** *(IO). The actual or anticipated net income that remains after all operating expenses are deducted from effective gross income but before mortgage debt service and book depreciation are deducted.*

**Operating expenses.** *The periodic expenditures necessary to maintain the real property and continue production of the effective gross income, assuming prudent and competent management.*

**Potential gross income** *(PGI). The total income attributable to real property at full occupancy before vacancy and operating expenses are deducted.*

**Vacancy and collection loss.** *A deduction from potential gross income (PGI) made to reflect income reductions due to vacancies, tenant turnover, and nonpayment of rent; also called vacancy and credit loss or vacancy and contingency loss. Often vacancy and collection loss is expressed as a percentage of potential gross income and should reflect the competitive market. Its treatment can differ according to the interest being appraised, property type, capitalization method, and whether the property is at stabilized occupancy.*

**Income Analysis**

As discussed, the subject is currently leased.  As there are lease encumbrances, the scheduled income has been considered.  In addition, the income potential of the subject property has been estimated herein based upon a survey of recent lease comparables in the subject's competing market area.

**Lease structure**

The structure of leases has a significant impact on rental rates.  Generally, there are two primary types of leases for properties in the subject's competing market area: a modified gross lease and a triple net lease. Within these lease structures, there are various modifications that can be made. A typical modified gross lease is structured so that the landlord incurs some of the operating expenses for the term of the lease.  A basic triple net lease is structured so that the tenant is required to pay all of the property's operating expenses, such as real estate taxes, insurance, maintenance and repairs, contract services/janitorial, utilities, administrative, and management. Replacement allowances are also the responsibility of the owner/landlord.  The income for the subject has been estimated on a triple net (NNN) basis.



INCOME APPROACH

**Market Rent Analysis**

In order to estimate the market rental value of the subject building, the subject's submarket was surveyed for lease comparables, which are similar to the subject property in terms of location features, unit/building size, condition, appeal and lease terms.  The results of the survey are summarized as follows.

| Comp | Address<br>*Use* | Unit SF<br>*Yr Blt* | Location<br>*Condition*<br>*Appeal* | Lease Date<br>*Term*<br>*Increases* | Lease Type<br>*Concessions* | Rent/SF |
|---|---|---|---|---|---|---|
| 1 | 6000 E. Slauson Ave.<br>Commerce<br>*Industrial* | 105,010<br>*1976* | Similar<br>*Similar*<br>*Similar* | 04/25<br>*3 years*<br>*N/Av* | NNN<br>*None* | $1.15<br>* |
| 2 | 5811 E. 61st St.<br>Commerce<br>*Industrial* | 100,566<br>*1948* | Similar<br>*Similar*<br>*Similar* | 04/25<br>*N/Av*<br>*N/Av* | NNN<br>*None* | $1.10<br>* |
| 3 | 2034 E. 27th St.<br>Vernon<br>*Industrial* | 126,563<br>*1966* | *Similar*<br>*Similar*<br>*Similar* | 02/25<br>*5 yrs, 5 mo*<br>*N/Av* | NNN<br>None | $1.12 |
| 4 | 7261 E. Slauson Ave.<br>Commerce<br>*Industrial* | 107,894<br>*1985* | *Similar*<br>*Similar*<br>*Similar* | 12/24<br>*N/Av*<br>*N/Av* | NNN<br>None | $1.05<br>* |

*  *Asking lease rate.*



57

INCOME APPROACH

*LOCATION MAP – LEASE COMPARABLES*





58

INCOME APPROACH

### *LEASE COMPARABLE SUMMARY*

| Comp | Use | Rent/SF | Status | Unit Size | Type Lease | Loc. | Qual. | Cond. | Ind. For Subj. |
|------|-----|---------|--------|-----------|------------|------|-------|-------|----------------|
| 1 | Indust. | $1.15 | Leased -5% | 105,010 | NNN | Sim. | Sim. | Sim. | $1.09 |
| 2 | Indust. | $1.10 | Leased -5% | 100,566 | NNN | Sim. | Sim. | Sim. | $1.05 |
| 3 | Indust. | $1.12 | Leased | 126,563 | NNN | Sim. | Sim. | Sim. | $1.12 |
| 4 | Indust. | $1.05 | Leased -5% | 107,894 | NNN | Sim. | Sim. | Sim. | $1.00 |

*\* Asking lease rate.*

***Lease Comparables Comments***

A detailed search was performed for recent comps in the subject's immediate market area, however no recent lease comps were found.  The lease comparables selected are all located within the subject's competing market area (no location adjustments were determined to be warranted) and were considered to be good indicators of the subject's lease rates.

The asking lease rate was reported for comps # 1, # 2 and # 4 (not the scheduled or effective lease rate) and these comps adjusted (-5%) for potential lease concessions/rent reductions. The subject is leased on a NNN basis.  All of the comps are leased on a similar NNN basis and no adjustment for lease type are determined to be warranted.

The lease comparables are compared to the subject property with regard to the location factors and lease terms and physical attributes.  All of the lease comps were considered to be similar to the subject in quality, condition and appeal and no adjustments were determined to be warranted.  Although there were differences between the subject and the comps in building size, floor area ratio, clearance and parking, no adjustments were determined to be warranted.

After adjustments, the lease comps range from $1.00 - $1.12 per sq. ft. on a NNN basis, with an average of $1.07 per sq. ft.  The estimated market lease rate for the subject is determined to be $1.05 per sq. ft., NNN.



INCOME APPROACH

### *SCHEDULED & ESTIMATED MARKET RENT ANALYSIS*

| *Tenant* | *Start* *End* | *Options* *Increases* | Lease Type | SF | Sched. Rent | Sched. Rent/SF | Est. Rent | Est. Rent/SF |
|---|---|---|---|---|---|---|---|---|
| ReadySpaces LA Downtown | 01/01/18 *12/31/32* | *None* *+ 3% per year* | NNN | 123,411 | $ 84,064 | $0.68 | $ 84,064 | $0.68 |

### *Comments on Lease:*

The subject is leased to 2938 E. 54th St. Warehousing LLC, a California limited liability company (dba ReadySpaces LA Downtown).  The lease commenced on January 1, 2018 for a 15 year period.  This is a NNN lease.  The annual rent increases +/- 3% per year.  The agreed use is for the lessee to sublease custom sized storage, distribution and manufacturing space for small businesses.

The lease is guaranteed by 240 Dollar Avenue Storage, a California limited liability company, Zim Diversified, Inc., a California corporation, 153 W. Rosecrans Avenue Storage LLC, a California limited liability company, Kevin Petrovic and Jonathan S. Zimmerman.

According to the Addendum to Standard Industrial/Commercial Single-Tenant Lease – Net, dated October 9, 2017, "lessor may terminate the Lease at any time after January 1, 2028 with a least 6 months prior written notice" (see agreement for additional terms with regard to termination conditions).

The subject's schedule lease rate ($0.68 per sq. ft., NNN) is significantly below the range of the lease comps analyzed.  The estimated rent for the subject has been based upon the scheduled lease rate.  The lower risks associated with the lower rent has been taken into consideration in the selection of the capitalization rate.

### ReadySpaces LA Downtown

The subject is leased to ReadySpaces LA Downtown. ReadySpaces offers flexible warehouse and office spaces suitable for small businesses, with amenities like loading docks, 24/7 access, CCTV monitoring, secure entry points and shared equipment.  ReadySpaces offers flexible unit sizes (ranging from 100 to 5,000 square feet), industrial workspace (suitable for light manufacturing, packaging, assembly, and more) and all-inclusive pricing.   Additional amenities include conference rooms, private offices, loading docks, and drive-in doors are available to enhance business operations.



60

INCOME APPROACH

### INCOME AND EXPENSE ANALYSIS COMMENTS

The actual property expenses were not submitted.  The estimated expenses taken into consideration are based upon typical expenses for this type of property.

**Vacancy**

Utilizing CoStar Analytics, an industrial vacancy analysis was performed in the subject's immediate area (3 mile radius).  Overall industrial vacancy appears to have been stable in the subject's competing market area in the 2 years preceding the effective date of valuation (from +/- 4.6% to 8.1%).    The vacancy rate as of QTD 2nd Quarter 2025 is 5.0%.  The subject is comprised of an industrial property leased to one tenant.  The subject is leased substantially below market levels, and the lessee has constructed significant tenant improvements.  These factors significantly reduce the risk of vacancy. Taking the aforementioned into consideration, the stabilized market vacancy for the subject is estimated at 2%.



**Management**

Typical management expenses range from 2% - 5%.  The subject property is leased to 1 tenant and the ease of management justified an expense of 3% of EGI.

**Miscellaneous and Reserves**

This expense includes the owner's pro rata share of overall expenses and a reserve allowance for short life items within the building such as heating systems, roof, electrical equipment, etc. It is typically estimated between $0.25 and $0.75 per sq. ft. depending on the age, condition and original quality of the improvements.  Taking into consideration the quality and condition of the subject project, the miscellaneous and reserves were estimated at $0.25 per sq. ft.



61

<u>INCOME APPROACH</u>

### *CAPITALIZATION RATE ANALYSIS*

**Market Survey**

A search was performed for reported income and capitalization rates from recent sales in the subject's competing market area, however, there have not been a significant number of industrial building sales in the subject area with reported income and expense data.  Five sales were found in the surrounding market areas, which were determined to be comparable to the subject (see below).

|   | Address<br>*Use* | Sale Date | Sale Price | Bldng SF | Yr Blt | Cap Rate |
|---|---|---|---|---|---|---|
| 1 | 12301 Woodruff Ave.<br>Downey, CA<br>*Multi-tenant industrial building* | 06/17/24 | $7,050,000 | 30,800 SF | 1962 | 4.30% |
| 2 | 1202-1210 Mateo St.<br>Los Angeles, CA<br>*Single-tenant industrial building* | 05/28/24 | $7,730,000 | 21,124 SF | 1924/<br>2021 | 5.77% |
| 3 | 3001 W. Mission Rd.<br>Alhambra, CA<br>*Single-tenant industrial building* | 06/28/23 | $9,500,000 | 53,672 SF | 1956/<br>1988 | 4.94% |
| 4 | 1605 Beach St.<br>Montebello, CA<br>*Single-tenant industrial building* | 05/01/23 | $6,654,000 | 26,400 SF | 1964 | 6.00% |
| 5 | 3333 S. Grand Ave.<br>Los Angeles, CA<br>*Single-tenant industrial building* | 03/31/23 | $21,000,000 | 102,150 SF | 1986 | 4.50% |
|   | *Averages* | | *$10,386,800* | *46,829 SF* | *1924-<br>1921* | *5.11%* |

The capitalization rates of the sales range from 4.30% - 6.00%, with an average of 5.11%.  The subject is single-tenant industrial property.  The estimated rent (which has been based on the scheduled lease rate) is substantially below market levels, which reduces the risks for a potential investor.  Taking the aforementioned into consideration, the indicated capitalization rate for the subject is determined to be 4.50%.



62

INCOME APPROACH

**Income and Expense Analysis**

Applying the income and expense estimates discussed and analyzed in the previous subsections, the following is a summary of the estimate for stabilized net operating income.

| | | |
|---|---|---|
| Total projected gross monthly income | $ 84,064 | |
| Total projected gross annual income | $1,008,774 | |
| Minus estimated vacancy and collection loss  (2%) | -$   20,176 | |
| Effective gross income | $  988,599 | |

**Less expenses**

| | Estimate | | |
|---|---|---|---|
| Real estate taxes | Tenant | | |
| Insurance | Tenant | | |
| Maintenance and repairs | Tenant | | |
| Contract services/janitorial | Tenant | | |
| Utilities (electric, water/sewer) | Tenant | | |
| Management | $  29,658 | 0.24 | |
| Misc. & Reserves | $   30,853 | 0.25 | |
| ***Totals*** | ***$  60,511*** | ***0.49*** | -$   60,511 |

| | |
|---|---|
| Net operating income | $   928,088 |
| | |
| Direct capitalization  ($ 928,088  / .045) | $20,624,177 |
| | |
| **Rounded to** | **$20,625,000** |



### *RECONCILIATION AND FINAL VALUE ESTIMATE*

All three traditional methods of valuation were considered in this analysis. The cost approach was not considered to be a reliable indicator of market value and was not performed. The sales comparison approach and the income approach were considered to be the most reliable methods of valuation and were solely considered in this analysis. The results are as follows:

| | |
|---|---|
| Cost Approach | Not considered |
| Sales Comparison Approach | $ 25,300,000 |
| Income Approach | $ 20,625,000 |

As previously discussed, the cost approach was not relied upon for the following reasons:

- The subject area is fully built up and there were not good comparable land sales;
- The subject improvements are over 40 years old. This tends to diminish the reliability and accuracy of estimating accrued depreciation;
- Market participants rely primarily on the Sales Comparison and Income Approaches to value

The application of the sales comparison approach includes an accumulation and analysis of comparable industrial properties in the subject's competing market area. Adjustments have been made for dissimilarities and this approach to value resulted in a conclusion which was relied on in this appraisal.

The income capitalization approach to value best represents an investment approach to value. The income approach is an analysis of the present value of the future benefits of property ownership measured by the capitalization of net operating income. The value derived in the income approach is lower than the value derived in the sales comparison approach, which reflects the subject's below market income.

No value was given to non-realty items in this appraisal.

**Conclusion**

Giving equal consideration to the sales comparison approach and the income approach and after considering all of the various factors involved, the estimated market value of the leased fee interest in the subject property, as of April 18, 2025, is:

**Twenty Two Million Nine Hundred and Sixty Five Thousand Dollars**

**($22,965,000)**



64

STATEMENT OF LIMITING CONDITIONS AND ADDENDA

### STATEMENT OF BASIC ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal report is made expressly subject to the conditions and stipulations following:

1.      This report is made for the client to whom it is addressed and is delivered to the client on the condition that it is to be used by said client only for the purpose stated in the report.  No reliance is to be placed on this report for any other purposes nor shall it be published, distributed or shown to other parties except to the party to whom the report is addressed.

2.      No responsibility is assumed for matters legal in character.  We render no opinion as to the title, but assume that it is marketable.  The property is appraised as though free and clear of all liens and encumbrances, except as otherwise indicated.  Management and ownership are presumed to be competent and responsible.

3.      All drawings and diagrams in this report are included to assist the reader in visualizing the property.  These drawings do not represent the product of any professional survey made by this office.  The appraiser is not a professional engineer, and no engineering survey of the property has been made, nor are we reporting on structural adequacy.

4.      No right to expert testimony, attendance in court, or publication is indicated with possession of this report.

5.      The appraiser has no present or contemplated future interest in the property.

6.      Rentals and other income have been supplied by the owner and have not been subjected to independent verification, unless otherwise noted.  Expenses are based either on data supplied by the owner or are the appraiser's own estimate.  Other factors reported in the report are correct to the best of the appraiser's knowledge and belief.  Market data is based on information reported by lessors and sellers, and lessees and buyers.  Since not all transactions are reported and some information may be inaccurate, available market information may not accurately reflect the status of the market.

7.      Our opinion assumes that the existing improvements comply with building and zoning codes of the municipality in which it is located, unless otherwise noted.

8.      Any proposed improvements are assumed to have been completed unless stipulated otherwise in this report; and construction is assumed to conform to the building plans and/or improvement descriptions included in the report.  Proposed or under construction programs frequently require changes in design, layout, dimensions or use.  Should the premises under review as described in this report, necessitate such changes, our final estimate of value is not applicable.  In order to obtain a fair evaluation of any report, it must be considered in its entirety, including the above limiting and contingent conditions.

9.      Cash flow projections are forecasts of estimated future operating characteristics and are predicated on the information and assumptions contained within the appraisal report.  The achievement of the financial projections will be affected by fluctuating economic conditions and



65

STATEMENT OF LIMITING CONDITIONS AND ADDENDA

is dependent upon other future occurrences that cannot be assured.  Actual results may well vary from the projections made herein.  The appraisers do not warrant that these forecasts will occur.  Projections may be affected by circumstances beyond the current realm of knowledge or control of the appraisers.

10.    This appraiser assumes that the property is free of all hazardous materials and toxic wastes.  The presence of hazardous materials or toxic wastes on the property can substantially impact the value of the property.  A variety of materials including chemicals, metals and minerals have been determined to be hazardous or toxic under local, state and/or federal laws and regulations and can be required to be specially handled and removed from the property at the expense of the property owner.  Certain materials which may have been used in the construction of the premises or in building components may be hazardous.  Asbestos, for example, can be hazardous and has been included in a number of building components such as fireproofing, insulation, linoleum, floor tiles, ceiling panels and acoustic ceiling coatings.  Appraisers are not experienced in identifying potential toxic waste and hazardous material problems or estimating the cost of resolving such problems.  In order to identify the nature and extent, if any, of toxic waste and hazardous material problems on the property, the appropriate experts should be selected and retained.

11.    Except as noted, this analysis assumes the land to be free of adverse soil conditions which would prohibit development of the property to its highest and best use.  We assume no liability as to the soils condition of the subject site.  This analysis is of surface rights only, and no analysis has been made of the value of subsurface rights, if any.  In addition, we assume that there are no significant surface or subsurface archeological conditions that may impact value.

12.    We assume that all building systems, including electrical, mechanical, and plumbing, are in good operating condition.  The appraiser has not inspected these systems nor is he qualified to comment on the condition of the systems.  An expert in these fields should be retained for an inspection.  Except as otherwise noted in this report, the property is appraised as though there are no soils, structural, mechanical or other defects or problems with it.

13.    Disclosure of the contents of this report is governed by the Bylaws and Regulations of the Appraisal Institute.  This appraisal report has been developed and prepared in conformity with and subject to the requirements of the Appraisal Institute's Code of Professional Ethics and Uniform Standards of Professional Appraisal Practice of the Appraisal Institute and Appraisal Foundation.

14.    Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the analyst or the firm with which he is connected, or any reference to the Appraisal Institute or to the MAI or RM designation) shall be disseminated to the public through the advertising media, public relations media, news media, sales media or any other public means of communication without prior written consent and approval of the analyst.

16.    The Americans With Disabilities Act became effective January 26, 1992.  The appraiser neither has nor made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that the compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not compliance with one or more of the requirements of



66

STATEMENT OF LIMITING CONDITIONS AND ADDENDA

the act.  If so, this fact could have a negative effect upon the value of the property.  Since the appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

17.    Appraisers are not qualified to detect hazardous waste and/or toxic materials.  Any comment by the appraiser that might suggest the possibility of the presence of such substances should not be taken as confirmation of the presence of hazardous waste and/or toxic materials.  Such determination requires investigation by a qualified expert in the field of environmental assessment.  The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property.  The appraiser's value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value.

18.    No responsibility is assumed for any environmental conditions, or for any expertise or engineering knowledge required to discover them.  The appraiser's descriptions and resulting comments are the result of the routine observations made during the appraisal process.

19.    It is the intention of the appraiser and a policy of b Alex, Inc. that this report comply with all statutes, rules, and regulations prohibiting discrimination on the basis of race, color, religion, sex, national origin, and marital status.

20.    The liability of *b Alex, Inc.*, its agents or employees is limited to the client only and only up to the amount of the fee actually received for the assignment.  No third parties other than the client may rely upon this appraisal for any purpose whatsoever, including the provision of financing for the subject property.  This appraisal was prepared specifically for *Mr. Jeffrey Seltzer, c/o Edgcomb Law Group, LLP* to whom this appraisal is addressed.

21.    This appraisal was prepared specifically for our client, *Mr. Jeffrey Seltzer, c/o Edgcomb Law Group, LLP*.  Third parties who desire an appraisal of the subject property for their use should contact Brian Bregman.



67

STATEMENT OF LIMITING CONDITIONS AND ADDENDA

## Legal Description

PARCEL 1:

THAT PORTION OF LOT 2 OF TRACT 679, IN THE CITY OF LOS ANGELES, COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 17 PAGE 24 OF
MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS
FOLLOWS:

BEGINNING AT A POINT IN THE SOUTHERLY LINE OF SAID LOT 2, DISTANT NORTH 77° 17'
47" WEST THEREON, 234.49 FEET FROM THE MOST SOUTHERLY CORNER OF SAID LOT 2;
THENCE NORTH 0° 23' 34" WEST, PARALLEL WITH THE EASTERLY LINE OF SAID LOT 2, A
DISTANCE OF
518.48 FEET; THENCE NORTH 89° 46' 48" EAST, PARALLEL WITH THE NORTHERLY LINE OF SAID
LOT 2, A DISTANCE OF 228.39 FEET TO SAID EASTERLY LINE; THENCE NORTH 0° 23' 34" WEST,
ALONG SAID EASTERLY LINE 529.56 FEET TO A POINT DISTANT SOUTH 0° 23' 34" EAST
THEREON, 90.90 FEET FROM THE NORTHEASTERLY CORNER OF SAID LOT 2; THENCE SOUTH 89°
46' 48" WEST, PARALLEL WITH THE NORTHERLY LINE OF SAID LOT 2; A DISTANCE OF
396.40 FEET TO A LINE, PARALLEL WITH SAID EASTERLY LINE AND WHICH PASSES
THROUGH A POINT IN SAID SOUTHERLY LINE MIDWAY BETWEEN THE SOUTHEASTERLY
AND SOUTHWESTERLY CORNERS OF SAID LOT 2; THENCE SOUTH 0° 23' 34" EAST ALONG
PARALLEL LINE, 1009.52 FEET TO SAID SOUTHERLY LINE; THENCE SOUTH 77° 17' 47" EAST,
ALONG SAID SOUTHERLY LINE 172.49 FEET TO THE POINT OF BEGINNING.

EXCEPT THAT PORTION OF SAID LAND LYING SOUTHERLY OF A LINE DRAWN AT
RIGHT ANGLES WITH THE WESTERLY LINE OF THE HEREINABOVE DESCRIBED LAND
AND WHICH PASSES THROUGH A POINT IN SAID WESTERLY LINE, DISTANT NORTH 0°
23' 34" WEST THEREON, 443.48 FEET FROM THE SOUTHWESTERLY CORNER OF SAID
LAND.

EXCEPT THEREFROM AN UNDIVIDED ONE-HALF INTEREST IN AND TO ALL OIL, GAS,
AND OTHER HYDROCARBON SUBSTANCES AND IN AND TO ANY OTHER MINERAL OF
ANY KIND OR CHARACTER IN, UNDER AND UNDERLYING THE SURFACE OF THE
ABOVE DESCRIBED PROPERTY, TOGETHER WITH THE RIGHT OF INGRESS AND
EGRESS THERETO AS RESERVED BY
H. W. ROHL AND FLOY E. ROHL, IN THE DEED RECORDED SEPTEMBER 11, 1943
AS INSTRUMENT NO. 704 IN BOOK 20275 PAGE 160 OF OFFICIAL RECORDS.

PARCEL 2:

A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS OVER THE EASTERLY 32 FEET
OF THAT PORTION OF SAID LOT 2 HEREINBEFORE DESCRIBED AS AN EXCEPTION FROM
PARCEL 1, AS GRANTED BY LADY'S CHOICE FOODS, A CORPORATION, TO STANDARD COIL
PRODUCTS CO. INC., AN ILLINOIS CORPORATION BY DEED RECORDED JUNE 9, 1950 IN
BOOK 33339 PAGE 157 OF OFFICIAL RECORDS.



68

STATEMENT OF LIMITING CONDITIONS AND ADDENDA

**Legal Description – Continued**

PARCEL 3:

THAT PORTION OF LOT 2 OF TRACT NO. 679, IN THE CITY OF LOS ANGELES, COUNTY OF
LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 17 PAGE 24 OF
MAPS, AND THAT PORTION OF LOT 35, OF TRACT NO. 12524, AS PER MAP RECORDED IN
BOOK 236 PAGES 5 TO 7 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER
OF SAID COUNTY, DESCRIBED AS A WHOLE FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID LOT 35; THENCE NORTH 22° 45' 14" EAST
ALONG THE EAST LINE OF SAID LOT 35, A DISTANCE OF 87.24 FEET; THENCE NORTH 75° 02' 37" WEST
35.56 FEET TO A POINT IN THE EASTERLY LINE OF SAID LOT 2 DISTANT THEREON SOUTH 0° 23' 34"
EAST 35.00 FEET FROM THE NORTHEAST CORNER OF SAID LOT 2, THENCE NORTH 63° 41' 22" WEST
78.36 FEET TO THE MOST WESTERLY CORNER OF SAID LOT 35; THENCE SOUTH 89° 46' 48" WEST
ALONG THE NORTH LINE OF SAID LOT 2, A DISTANCE OF 326.40 FEET, MORE OR LESS, TO A LINE
PARALLEL WITH THE EAST LINE OF SAID LOT 2 THAT PASSES THROUGH THE MIDDLE POINT IN THE
SOUTHERLY LINE OF SAID LOT 2; THENCE SOUTH 0° 23' 34" EAST ALONG SAID PARALLEL LINE 90.90
FEET; THENCE NORTH 89° 46' 48" EAST PARALLEL WITH THE NORTH LINE OF SAID LOT 2, A
DISTANCE OF 396.40 FEET TO THE WESTERLY LINE OF SAID LOT 35; THENCE SOUTH 0° 23' 34" EAST
ALONG SAID WEST
33.74 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

APN: 5215-014-005 and 5215-014-006



69

STATEMENT OF LIMITING CONDITIONS AND ADDENDA

**Brian Alex Bregman**
b Alex (Principal)
5850 Canoga Ave.
Woodland Hills, CA 91367 (818) 225-9550

**Professional Affiliations**
Certified General (State of California  #AG 008978)
Member, Appraisal Institute

**Types of Properties Appraised & Services**
Single Family and Multi Family Residences, Subdivisions, Commercial and
Industrial Properties, Vacant Land, Hotels, Special Purpose Properties,
Portfolios, Tax Reassessment, Diminution in Value, Eminent Domain, Estate
Planning, Qualified Expert Witness

**Education**

| | |
|---|---|
| 1982-1986 | **Claremont Mckenna College**<br>Claremont, California<br>Degree:  Bachelor of Arts<br>Major:  Political Science<br>Relevant Courses:  Economics, Statistics, Calculus, Legal Analysis, Computer Analysis |
| 1986-1987 | **University of California Los Angeles**<br>Los Angeles, California<br>Extension Course:  Real Estate Appraisal<br>Extension Course:  Real Estate Principles |
| 1987-Present | **Appraisal Institute (Formerly AIREA)**<br>Various Locations in the United States<br>Course:  Real Estate Principles<br>Course:  Basic Valuation Procedures<br>Course:  Standards of Professional Appraisal Practice, Parts A, B, C<br>Course:  Capitalization Theory and Techniques, Part A<br>Course:  Capitalization Theory and Techniques, Part B<br>Course:  Case Studies in Real Estate Valuation<br>Course:  Report Writing and Valuation Analysis<br>Course:  Advanced Sales Comparison and Cost Approaches<br>Course:  Highest and Best Use |

**Professional Experience**

| | |
|---|---|
| 1985-1986 | Department of Justice - Legal Intern<br>Document Analysis (including Real Estate Appraisals) and Case Investigation |
| 1986-1993 | Sentry Appraisal - Real Estate Appraiser - Independent Contractor |
| 1993-Present | B Alex - Real Estate Appraiser and Consultant – Principal |



70